**WAYNE CHEMICAL, INC., et al., Plaintiffs,**

**v.**

**COLUMBUS AGENCY SERVICE CORP. et al., Defendants.**

**Civ. No. F 76–50.**

United States District Court, N. D. Indiana, Fort Wayne Division.

Jan. 19, 1977.

Sherrill Wm. Colvin, Fort Wayne, Ind., for plaintiffs.

Clifford E. Simon, Jr., Fort Wayne, Ind.; Duke W. Thomas, Columbus, Ohio, William

F. McNagny, Fort Wayne, Ind., for defendant O'Rourke, Inc.

## MEMORANDUM OF DECISION AND ORDER

ESCHBACH, Chief Judge.

This cause is before the court on the plaintiffs' request for a preliminary injunction. An evidentiary hearing was held on this request on December 30, 1976. For the reasons given below, the plaintiffs' request will be granted.

This case was originally filed in the Allen Circuit Court, Fort Wayne, Indiana. The defendants removed on the basis of diversity and federal question, and in the order of August 26, 1976, the court denied the plaintiffs' motion to remand. In that order, the court found federal jurisdiction based on diversity of citizenship and the requisite amount in controversy. Since entry of that order, the plaintiffs have, by amended complaint, joined certain nondiverse parties defendant. The addition of defendants who are nondiverse, under the weight of authority, does not defeat removal jurisdiction which has already properly attached. See 1A Moore's Federal Practice ¶ 0.161[1] (2d ed. 1974). Moreover, although the court concludes that there is jurisdiction by reason of diversity of citizenship, the court finds also that there is jurisdiction based alternatively on the existence of a federal question. For reasons that will be discussed herein, the court concludes that the plaintiffs seek to enforce rights under an employee benefit plan, within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132.

## I.

Through stipulation of the parties, it has been established for purposes of this request for a preliminary injunction that Robert C. Tribolet is an employee of Wayne Chemical, Inc., and is covered by a group medical and health plan. Thomas C. Tribolet is the son of Robert C. Tribolet, and has been a covered dependent under said group medical and health plan. On or about July 24, 1975, Thomas Tribolet suffered catastrophic physical injuries requiring immediate medical care. These injuries rendered Thomas Tribolet a quadriplegic; his physical impairment requires and will require in the foreseeable future constant and extensive medical care and treatment.

Wayne Chemical procured the policy in question through the services of Kenneth Gray, an insurance salesman for O'Rourke, Andrews and Maroney, Inc. The policy was obtained from the Columbus Agency Service Corporation (CASCO). Coverage under the group medical plan became effective June 1, 1974. On June 1, 1975, Wayne Chemical received notice from CASCO that there had been a "substantial improvement in the Major Medical Coverage," effective June 1, 1975. Thereafter CASCO issued a notice "to our policyholders," stating that CASCO's program was being transferred to a new carrier, effective July 1, 1975, "for continuance of your coverage." Wayne Chemical later received notice from CASCO of a 12½% rate increase, effective August 1, 1975, and of a change in the deductible period. CASCO also notified its "Agents" that present coverage "with a few minor changes" would continue under the "new plan."

Wayne Chemical several times sought copies of the new policy from Kenneth Gray of O'Rourke, Andrews and Maroney, Inc. Gray informed Wayne Chemical, on November 5, 1975, that only the deductible had been changed. About December 18, 1975, Wayne chemical received from CASCO a set of pamphlets detailing the benefits for each employee.

On December 31, 1975, Kenneth Gray notified Wayne Chemical by letter that benefits for Thomas Tribolet would terminate on his reaching nineteen years of age, on January 6, 1976. Gray, on January 6, 1976, received from CASCO a notice of termination as to Thomas Tribolet. In a letter of January 7, 1976, Gray passed this information on to Wayne Chemical. By letter of April 6, 1976, however, Howard Morehouse, attorney for National Multiple Employers

foundation, the "underwriter" of the successor policy, notified plaintiffs' counsel that the benefits for Thomas Tribolet would continue until his twentieth birthday (January 6, 1977). This termination date was reiterated by Morehouse in a letter dated September 28, 1976. CASCO and National Multiple have abided by the Morehouse letters. The parties agree that Wayne Chemical has paid all premiums to CASCO from May 1, 1975 to present. The authenticity of several documents relating to this claim has also been stipulated.

At the hearing on this cause, Mr. William E. Spindler, the president of Wayne Chemical, disclosed that he has yet to receive a copy of the "new policy." He has been led to understand that he presently holds not insurance but some other benefit program, the nature of which is unclear to him. Treating the arrangement as if it were nonetheless a major medical insurance program, Spindler has continued to make premium payments. Spindler confessed that he was not familiar with all the terms of the policy. At a meeting with Wally Berny, a CASCO representative, in December of 1975, Spindler first became aware that a "master policy" existed and that the pamphlets he had received did not constitute the policy. Spindler subsequently made several requests for a copy of the "master."

By way of background, Kenneth Gray testified at the hearing that CASCO is the designer and "administrator" of the program in question and that Association Life and National Multiple "underwrote" the "package" designed by CASCO. CASCO is part of the "brokerage inventory" carried by the Ash brokerage company, with whom Gray dealt. At some point National Multiple replaced Association Life as "underwriter" of the plan in question. Gray had no part in this change nor in the change in the policy deductible period. He knew, when he first sold the plan, that it contained a provision allowing "conversion" by covered minors *without* evidence of insurability. In early 1976, he learned, without formal notice, that under the National Multiple (sub-

stitute) plan, there was no conversion privilege of this kind.

Referring to the original policy issued by Association Life, Gray acknowledged that the policyholder is described as "Trustees of the Casco Insurance Trust Fund," Group Policy Number 1438. Gray's understanding of the arrangement was that Wayne Chemical was to join in an "insurance trust fund" and would have an identification number as participant. Gray understood that the fund was intended to cover small employers such as Wayne Chemical, although the fund was also underwritten. Gray agreed that, by the terms of communications from CASCO in 1975, Wayne Chemical was identified as a "policy holder," and Gray was termed an "agent." Gray did not dispute that he treated the plan as group health insurance and termed it as such in his dealings with Wayne Chemical. Gray agreed also that the original "master agreement" was drawn between Association Life and CASCO.

Mrs. Patricia Tribolet, the mother of Thomas Tribolet, testified also. She described Thomas Tribolet's paralysis as essentially total. He has immediate need of a specially made hospital bed, an electric wheelchair, special supports, and other custom-designed equipment. In order to obtain these items, insurance coverage must be established. With such equipment, it would be possible for Mrs. Tribolet to care for her son at home.

The plaintiffs argue that, under Indiana law, the representations of the defendants bind them to the issuance of an individual policy of health insurance to Thomas Tribolet, without evidence of insurability, as provided under the original insurance policy. Furthermore, they invoke Ind. Code § 27–8–5–10(B)(4) (Burns 1975), which provides that group health insurance coverage of a dependent of an employee may not terminate on attainment of a limiting age where the dependent, at the time he reaches the limiting age, is disabled. The defendants contend that Indiana law has been preempted by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1144, and that no conversion privilege is

available under the terms of the National Multiple (successor) policy.

## II.

Resolution of this case must begin with a determination of the applicable substantive law. This question, in turn, is bound up with the scope of federal preemption under ERISA.

■ The preemption section of ERISA, 29 U.S.C. § 1144, is, in terms, quite broad. Under Section 1144(a), the provisions of ERISA "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." Under Section 1144(c), "State law" is defined to include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." Section 1144(b)(2)(A) makes clear that there is no intent to invalidate all state insurance codes. However, under Section 1144(b)(2)(B), no "employee benefit plan" may hereafter be deemed an

insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.[1]

■ The critical question, therefore, is whether the arrangement involved in this lawsuit is an "employee benefit plan" within the meaning of ERISA. This term is defined in 29 U.S.C. § 1002(3) so as to include "an employee welfare benefit plan." An "employee welfare benefit plan" in turn is defined as

any plan, fund, or program . . . established or maintained by an employer, . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing

for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment. . . .

29 U.S.C. § 1002(1)

Since the plan in question here was established in order to provide participants and their beneficiaries "medical, surgical or hospital . . . benefits," it plainly falls within the ERISA definition of an "employee welfare benefit plan." Regulations promulgated under the Act confirm that "group or group-type insurance" programs are generally within the scope of covered plans. *See* 29 C.F.R. § 2510.3–1(j). The regulations exclude such plans only where

(1) No contributions are made by an employer or employee organization;

(2) Participation in the program is completely voluntary for employees or members;

(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs. *Id.*

A cursory examination of the exhibits filed in this case reveals that Wayne Chemical pays the premium on the policy involved. Mr. Spindler, Wayne Chemical's president, testified to the same effect. Since a contribution to the plan is made by the employer,

---

1. The McCarron-Ferguson Act, 15 U.S.C. § 1012(b), provides that no "Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." This statute re-

quires some specific effort by Congress to overcome state laws regulating insurance. Here, of course, the Congress has specified the extent to which ERISA overcomes state law. Notwithstanding the McCarron-Ferguson Act, therefore, ERISA must be given effect in this case.

the exclusion under the regulations of certain group insurance plans is inapplicable here.

The legislative history of this statute also "shows that Congress intended absolute preemption of the field of employee benefit plans." *Azzaro v. Harnett,* 414 F.Supp. 473, 474 (S.D.N.Y. 1976). The preemption provisions, in their present broad scope, were the product of the conference committee. Speaking on behalf of the conference version of ERISA, Senator Javits explained the reinforced preemption section in these terms:

> Both House and Senate bills provided for preemption of State law, but—with one major exception appearing in the House bill—defined the perimeters of preemption in relation to the areas regulated by the bill. Such a formulation raised the possibility of endless litigation over the validity of State action that might impinge on Federal regulation, as well as opening the door to multiple and potentially conflicting State laws hastily contrived to deal with some particular aspect of private welfare or pension benefit plans not clearly connected to the Federal regulatory scheme. 120 Cong.Rec. S15751 (daily ed. August 22, 1974).

The point is clear. The courts are to be spared the task of deciding whether a particular state law governing some aspect of an employee benefit plan may be enforced concurrently with federal law. Rather, the preemption question is to be resolved relatively easily by determining whether the plan in question is a covered federal plan.[2] Since the court concludes that the benefit plan here is a covered federal plan, the court is led also to the conclusion that no state statute, regulation, or common law rule, operating of its own force, may govern any aspect of this case.[3]

The inquiry may not end there, of course. Although state law is inapplicable, and no specific federal statute governs the issues involved in this case, the court is not powerless to act. Rather, Congress has invested the courts with a duty to create law governing aspects of employee benefit plans not specifically regulated by ERISA. An examination of the legislative history reveals that civil actions under ERISA impose a duty on the court to fashion federal common law. In the House Conference Report accompanying Pub. L. 93–406, it is specified that such actions, whether filed in the state or federal courts,

> are to be regarded as arising under the laws of the United States in similar fashion to those brought under section 301 of the Labor-Management Relations Act of 1947. [1974] U.S. Code Cong. & Admin. News, pp. 5106–07.

Under section 301 of the LMRA, 29 U.S.C. § 185, to which the legislative history refers, the courts have been required to fashion a federal common law governing collective bargaining. *See Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Senator Javits, speaking on behalf of the conference version of ERISA, spoke also of this law-making function with regard to employee benefit plans.

> In view of Federal preemption, State laws compelling disclosure from private welfare or pension plans, imposing fiduciary requirements on such plans, imposing criminal penalties on failure to contribute to plans—unless a criminal statute of general application—establishing State termination insurance programs, et cetera, will be superseded. It is also intended that a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obliga-

---

**2.** Resolving the interplay between federal and state laws through such a bold stroke does prevent costly litigation over the preemption issue. However, it also imposes countervailing costs. This case is an example. Here the court is required, in the absence of operative state law, to fashion a federal rule of decision. It remains to be seen whether, in the long run,

this approach may not itself result in excessive litigation costs.

**3.** Since the plan involved is an "employee benefit plan," the claim here is one to determine rights under an ERISA plan and there is federal jurisdiction of the action under 29 U.S.C. § 1132.

tions under private welfare and pension plans. 120 Cong.Rec. S15751 (daily ed. August 22, 1974).

 The creation of a federal common law governing such plans may be implied, moreover, from the statutory scheme itself. Where state law is preempted and no specific federal provision governs, a "court is forced to make law or leave a void where neither state nor federal law applies. In such a situation it is a reasonable inference that Congress intended some law, and therefore federal law, to apply." *Note, The Federal Common Law,* 82 Harv.L.Rev. 1512, 1522 (1969). The court concludes that the statutory scheme, as well as the legislative history of ERISA, support the "reasonable inference" that this court is mandated to formulate and apply a federal rule of decision in this case.

### III.

Having reached the conclusion that federal common law must control the result in this case, the content of the federal rule to be formulated remains to be considered. The approach which must be adopted is clear, however. The court has as a model the development of decisional law pursuant to section 301 of the Labor Management Relations Act. It has been recognized that there is often only a thin line between the creation of a federal common law and the interpretation and application of federal statutory mandates by the courts. *See, e.g., H. Hart & H. Wechsler, The Federal Courts and the Federal System* 770 (2d ed. 1973). A court in deciding a section 301 case "makes law," of course, but the source of that law is the federal labor policy as expressed through statute. *See, e.g., Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 457, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). As Mr. Justice Harlan stated in a related context,

It has always been the duty of the common-law court to perceive the impact of

major legislative innovations and to interweave the new legislative policies with the inherited body of common-law principles—many of them deriving from earlier legislative exertions.

*Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 392, 90 S.Ct. 1772, 1783, 26 L.Ed.2d 339 (1970).

The guideposts in fashioning a rule of decision in the present case are the policies underlying ERISA. By its terms, of course, ERISA does not control what might be termed "beneficial rights" under an employee benefit plan. Rather, ERISA specifically addresses national problems which have arisen in the past with respect to the vesting, funding, and administration of these plans. ERISA, as implemented, imposes broad financial disclosure and other requirements upon those responsible for maintaining pension and other funds for the benefit of the American worker. In passing ERISA, however, Congress specifically found it desirable, "in the interests of employees and their beneficiaries, for the protection of the revenue of the United States, and to provide for the free flow of commerce, that minimal standards be provided assuring the equitable character of such plans and their financial soundness." 29 U.S.C. § 1001. Congress found also that, due to mismanagement, "employees and their beneficiaries have been deprived of anticipated benefits." *Id.* Congress set forth these concerns, of course, with an eye to the specific issues of vesting and funding regulated by the statute. However, it is appropriate also to consider the broadly ameliorative policy of the Act in reaching a decision on the striking facts before this court.

The court turns initially to the question of convertibility. The original policy issues th Wayne Chemical in this case contained a provision captioned "Hospital and Surgical Expense Conversion Privilege." [4] The first

---

4. This provision reads as follows:

HOSPITAL AND SURGICAL EXPENSE CONVERSION PRIVILEGE

If hospital, surgical, or comprehensive major medical expense insurance under the Policy

terminates because of termination of the Certificateholder's membership in the class or classes eligible for insurance, the Certificateholder, if he has been insured under the Policy for at least three months, will be entitled to

paragraph provides that if "hospital, surgical, or comprehensive major medical expense insurance" coverage under the policy terminates, the policyholder is entitled, "without evidence of insurability," to issuance of "an individual policy of hospital-surgical insurance," effective on termination of the group policy. The second paragraph extends a similar right to dependent children. By express limitation, the conversion right is not extended to any person eligible for Medicare coverage at the date of conversion. Defendants CASCO, National Multiple, ND & Associates, Inc., and Nicholas J. Dolwett claim that Thomas Tribolet is eligible for Medicare and accordingly not eligible for conversion. Moreover, these defendants claim that the convertibility provision is not applicable to them as the issuers of the successor policy, which they assert contains no conversion privilege.

There was no evidence presented at the hearing in this case from which the court could find that Thomas Tribolet is eligible for Medicare benefits at this time. There was no cross-examination of Mrs. Tribolet through which this evidence might have been elicited. The defense presented no evidence and no testimony was presented relating to Medicare. The court, therefore, finds that the policy's express Medi-care exclusion does not bar the relief sought in this case.

Nor, under the circumstances of this case, may the issuers of the successor policy defend on the basis that no conversion privilege is provided by that policy. They are bound by representations made to the contrary. CASCO issued a notice, sometime prior to July 1, 1975, that its insurance coverage would be transferred to a new underwriter effective July 1, 1975, through which coverage would be continued. CASCO also notified its policyholders that "coverage would be automatic as of July 1, 1975." This was the only information relating to the change in underwriters which was made available to Wayne Chemical prior to the catastrophic injury to Thomas Tribolet. The plaintiffs, to this day, have never been provided a copy of the successor policy, which is said by the defendants not to include a conversion right. The plaintiffs were thus denied the opportunity prior to the accident to seek an insurance policy which would allow convertibility. The law will not sanction silence where that silence misleads an innocent party to his injury. The plaintiffs had a right to rely on the continued existence of the conversion option. Therefore, the court holds that CASCO[5] must make available to Thomas Tribolet, as of the termination

---

have issued to him, without evidence of insurability, and individual policy of hospital-surgical insurance (herein called the converted policy) by making written application therefor and paying the first quarterly premium or, at the option of the Certificateholder, semi-annual or annual premium, to the Company within thirty-one days after termination of his insurance. The converted policy will be on the forms then being issued by the Company on conversion applications and will cover the Certificateholder and, if he so elects, his eligible dependents covered by the Policy on the date of termination. The premium for the converted policy will be that applicable on its effective date to the class of risks to which the covered persons belong, to the ages of the persons, and to the form and amount of insurance provided. The effective date of the converted policy will be the date of termination of insurance under the Policy.
Conversion as provided above will also be available, upon the death of the Certificateholder, to the surviving spouse with respect to the spouse and children then covered by the Policy, and will be available to a child solely with respect to himself upon his marriage or attaining the limiting age of coverage under the Policy.
Any benefits payable under the converted policy will be reduced by the amount of any hospital, surgical, or major medical benefits payable under the Policy after termination of the person's insurance.
Limitation
The Company will not be required to issue a converted policy covering any person who, at the date of conversion, is eligible to be covered under Title XVIII of the Social Security Act, as amended, commonly referred to as Medicare.

5. At this point the court cannot, and need not, resolve possible claims for indemnity among the several defendants. However, as the party which contracted with Wayne Chemcial, CASCO is clearly the appropriate defendant to bear the liability in the first instance.

date, a contract of insurance incorporating the terms of the conversion privilege contained in the original policy.[6]

Enforcement of the original conversion privilege against CASCO, however, fails to accord the plaintiffs complete relief. By the terms of the convertibility clause, "hospital, surgical, or major medical" group insurance may be converted only to an individual policy of "hospital-surgical insurance." Clearly, the "converted" policy does not extend to all major medical expenses. And "hospital-surgical" coverage seemingly would not extend to the specialized equipment needed by Thomas Tribolet.

The court is compelled, therefore, to turn to the application of the policy embodied in the Indiana "extension" statute invoked by the plaintiffs, Ind.Code § 27–8–5–10(B)(4) (Burns 1975).[7] The evident purpose of such a statute is to impose upon those issuing health care coverage certain catastrophic risks which would otherwise ultimately devolve upon state and federal welfare agencies. This is a legislative judgment which has gained acceptance in a considerable number of states.[8] The effect of ERISA, of

6. CASCO has argued that it cannot make such a converted policy available since it is not an insurance company. National Multiple is also said not to be an insurance company. However, both companies contract for services which are essentially insurance services. CASCO is apparently a consortium of employers in a "trust fund" which covers the medical risks of member employees. National Multiple "underwrites" the CASCO fund. Whatever the form, the contract between Wayne Chemical and CASCO encompasses an insurable interest, a risk of loss, an assumption of risk by CASCO, a general scheme to distribute the loss among a larger group bearing similar risks, and the payment of a premium for assumption of the risk, the generally accepted elements of an insurance contract. *See* Note, Consumer Warranty or Insurance Contract? A View Towards a Rational State Regulatory Policy, 51 Ind.L.J. 1103, 1104 (1976). Moreover, even were CASCO not an insurer, this is no basis for refusing to hold it to its obligation to issue such a policy as promised.

7. This statute reads as follows:
 If a group policy or hospital service plan contract or medical service plan contract provides that hospital or medical expense coverage of a dependent child of an employee or other member of the covered group terminates upon attainment of the limiting age for dependent children specified in the policy or contract, the policy or contract must also provide that attainment of such limiting age does not operate to terminate the hospital and medical coverage of such child while the child is and continues to be both (a) incapable of self sustaining employment by reason of mental retardation or physical handicap and (b) chiefly dependent upon the employee or member for support and maintenance. Proof of such incapacity and dependency must be furnished to the insurer by the employee or member within one hundred twenty days of the child's attainment of the limiting age. The insurer may require at reasonable intervals during the two years following the child's attainment of the limiting age subsequent proof of the child's disability and dependency. After such two year period, the insurer may require subsequent proof not more than once each year. The foregoing provision shall not require an insurer to insure a dependent who is a mentally retarded or physically handicapped child of an employee or other member of the insured group where such dependent does not satisfy the conditions of the group policy or contract as to any requirements for evidence of insurability or other provisions as may be stated in the group policy or contract required for coverage thereunder to take effect. In any such case, the terms of the policy shall apply with regard to the coverage or exclusion from coverage of such dependent.
 This subsection applies only to policies or contracts delivered or issued for delivery in this state after December 16, 1969.

8. In addition to Indiana, at least twenty-five states have passed legislation requiring insurers to extend the major medical coverage of dependents who are disabled at the time they reach the limiting age of the policy. Most of this legislation is of recent vintage. *See* Ark. Stat.Ann. §§ 66–3232.1, 66–3702(4) (1975); Cal.Ins.Code § 10118 (West 1972); 7 Conn.Gen. Stat. § 38–174e(a), (b) (1975); Fla.Stat.Ann. § 627.6615 (1972); Hawaii Rev.Stat. §§ 431–451, 431–452 (1975 Supp.); Ill.Rev.Stat. ch. 73, § 986b (Supp.1976); La.Rev.Stat. § 22:215.2 (Supp.1976); Mich.Comp.Laws Ann. § 24.-12264 (1972); Minn.Stat.Ann. § 62A.14 (Supp. 1976); Annot.Mo.Stat. § 376.776 (Vernon 1968); Mont.Rev.Code § 40–3738 (1975 Supp.); Neb.Rev.Stat. § 44–761(4) (1976 Cum.Supp.); N.H.Rev.Stat.Ann. § 415:5(3–a) (1975 Supp.); N.J.Stat.Ann. § 17B:27–30 (West 1976 Pamphl.); N.M.Stat.Ann. § 58–11–20 (1975 Supp.); N.C.Gen.Stat. § 58–251.3 (1975 Repl.); Ohio Rev.Code Ann. § 3923.24 (1975 Cum. Supp.); S.C.Code Ann. § 37–532.2 (Cum.Supp. 1975); S.D.Comp.Laws § 58–17–30.1 (1976 Supp.); V.A.T.S. Insurance Code, art. 3.70–2(C)

course, is to render state statutes of this sort inoperative with respect to any "employee benefit plan." However, the fact that the Indiana statute upon which the plaintiffs rely may not operate of its own force does not preclude its application as federal law. It is this question which the court must now address.

Where the courts are required themselves to fashion a federal rule of decision, the source of that law must be federal and uniform. Yet, state law where compatible with national policy may be resorted to and adopted as a federal rule of decision. *See, e. g., Zdanok v. Glidden Co.*, 327 F.2d 944 (2d Cir.), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). Here, of course, there is little federal law to which the court may turn for guidance. State regulation of insurance, pensions, and other such programs, however, provides a pre-existing source of experience and experiment in an area in which there is, as yet, only federal inexperience. Much of what the states have thus far developed, particularly in the insurance field, is statutory. In certain areas of public concern, the state legislatures have been quite active in enacting comprehensive regulatory schemes, and state statutory sources of law will no doubt play a major role in the development of a federal common law under ERISA, particularly in defining rights under employee benefit plans.

There is impressive authority for reference to state statutes in formulating federal common law rules of decision. In *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), the United States Supreme Court held that the general maritime law provides an action for wrongful death. In overruling ancient precedent, the court noted numerous state and federal statutory inroads upon the common law failure to provide a remedy for wrongful death. In the absence of a contrary legislative directive, mere legislative failure to provide such a remedy under the general maritime law was not seen as a bar to the judicial creation of the remedy. *See id.* at 390–403, 90 S.Ct. 1772.

Nor did the need to formulate a schedule of beneficiaries entitled to recovery constitute a bar to the judicial creation of the cause of action. The Court observed, without deciding, that the schedule of beneficiaries provided in the Death on the High Seas Act might be "borrowed" by the courts and that state wrongful death statutes could be referred to in resolving other "subsidiary issues." *Id.* at 406–08, 90 S.Ct. 1772. Therefore, although a certain cause of action is ordinarily a creature of statute, and its dimensions are legislatively defined, the courts might subsume statutory provisions, including state laws, in forming a federal common law remedy.

This court concludes that effectuation of the federal policy embodied by ERISA, and a circumspect regard for the state policies evidenced in statutes similar to the Indiana "extension" statute, demand that this state statutory policy be incorporated into the federal common law of employee benefit plans. To do otherwise would create anomalies not unlike those which the Court in *Moragne* sought to avoid. *See id.* at 394–97, 90 S.Ct. 1772. Absent a federal rule of this sort, beneficiaries of employee benefit plans are denied protection which is available under state law to beneficiaries of private plans in the majority of the states. Such a result would run contrary to the ameliorative policy underlying ERISA. Furthermore, it would not be consistent with congressional concern with ensuring coverage for employee benefit plan beneficiaries to oblige them under such circumstances to seek aid from state and federal welfare agencies. Finally, there is no indication that Congress sought to frustrate the important state policies represented by the "extension" statutes, particularly where those statutes do not hamper the ERISA program.

(Vernon 1976 Supp.); Vermont Stat.Ann., tit. 8, § 4090 (1976 Supp.); Code of Va. § 38.1–348.1 (1976 Repl.); Wash.Rev.Code Ann. § 48.20.420

(1975 Supp.); Wis.Stat.Ann. § 632.88 (1976 Special—Pamphl.); Wyoming Stat. § 26.1–453.2 (1975 Cum.Supp.).

**326**

Nor do the minor variations appearing in certain of the state "extension" statutes involved pose an insurmountable obstacle to their incorporation by reference as federal law. As the Court pointed out in *Moragne*, any such questions of detail can be resolved on a case-by-case basis in the common law tradition. *Id.* at 408, 90 S.Ct. 1772. To effectuate the federal and state policies involved, the court need only hold here that CASCO must continue major medical coverage of Thomas Tribolet under the terms of the original policy so long as he remains a dependent who is disabled by reason of physical handicap. Disability and dependency have been established, at least for purposes of the request for a preliminary injunction. CASCO may, at reasonable intervals, require further proof of such dependency and disability.

The plaintiffs having demonstrated a substantial probability of success at trial and the threat of irreparable injury, the preliminary injunction will issue. This memorandum contains the court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

### ORDER

Accordingly, it is ordered, adjudged, and decreed by the court that the defendants Columbus Agency Service Corporation and its officers, agents, servants, employees, successors and assigns are hereby enjoined and restrained until further order of the court from terminating insurance coverage of the major medical expenses of Thomas C. Tribolet, such coverage being defined by the terms of the policy of insurance issued to Wayne Chemical, Incorporated, under Group Policy Number 1438, which policy became effective June 1, 1974.

*Provided,* that upon presentation to the court of evidence establishing that plaintiff Thomas C. Tribolet is no longer disabled or dependent, this order will be withdrawn.

It is further ordered, adjudged and decreed by the court that the defendants Columbus Agency Service Corporation and its officers, agents, servants, employees, successors and assigns are hereby ordered to make available to Thomas C. Tribolet a policy of individual "hospital-surgical" insurance within the terms of the policy of insurance issued to Wayne Chemical, Incorporated, under Group Policy Number 1438, which policy became effective June 1, 1974.

*Provided* further, that the plaintiffs will not be required to post any security whatever for costs of this injunction. Such requirement from a family already unable to meet their huge medical expenses under the circumstances of this case where the plan benefits have at least in part not been paid would serve no purpose either in law or equity.