WAYNE CHEMICAL, INC., Robert C. Tribolet and Thomas C. Tribolet, Plaintiffs-Appellees,

v.

COLUMBUS AGENCY SERVICE CORPORATION, Defendant-Appellant.

No. 77–1281.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 29, 1977.

Decided Nov. 8, 1977.

Clifford E. Simon, Jr., Fort Wayne, Ind., Duke W. Thomas, Columbus, Ohio, for defendant-appellant.

Theodore L. Sendak, Atty. Gen., Indianapolis, Ind., David J. Brummond, Milwaukee, Wis., for amicus curiae.

Sherrill William Colvin, Vincent J. Heiny, Fort Wayne, Ind., for plaintiffs-appellees.

Before SWYGERT, CUMMINGS and TONE, Circuit Judges.

TONE, Circuit Judge.

Thomas C. Tribolet suffered an injury that made him a quadriplegic while he was 18 years old and still covered by a group medical insurance policy purchased by his father's employer. The insurance agency

through which the policy had been obtained had changed insurers 24 days earlier, and it ultimately developed that, under the policy issued by the new carrier, Thomas' benefits would end on his 20th birthday. This result was not permitted under Indiana law. Also, the new insurer was not authorized to insure risks in Indiana, which made the agent liable under Indiana law if the insurer defaulted on its obligation, as it ultimately did. The determinative question on this interlocutory appeal is whether these provisions of Indiana law favorable to Thomas were preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*, commonly known as ERISA.

In this action by Thomas, joined by his father and his father's employer, against the agent and others, the District Court held that ERISA did preempt state law but that a federal common law should be developed to fill the regulatory void created by preemption, and that under that federal common law Thomas' insurance benefits could not be terminated. The court entered a preliminary injunction against the agent enjoining it from terminating coverage and also ordering it to make available to Thomas a policy of individual hospital and surgical insurance, as provided by the policy that had been superseded 24 days before Thomas' injury. *Wayne Chemical, Inc. v. Columbus Agency Service Corp.,* 426 F.Supp. 316 (N.D.Ind.1977). We modify the order and affirm it as modified, but rely on reasons different from those relied on by the District Court.

### The Initial Purchase of Insurance

In 1974 plaintiff Wayne Chemical, Inc. purchased group medical insurance coverage for several of its employees and their families from an insurance salesman for a Fort Wayne, Indiana, insurance firm, defendant O'Rourke, Andrews & Maroney, Inc. One of these employees was plaintiff Robert C. Tribolet, father of Thomas. The O'Rourke firm obtained the insurance,

through an intermediate broker or agent, from defendant Columbus Agency Service Corporation, also known as "CASCO." The latter firm describes itself in its brief as "an insurance and health plan brokerage company," which "acts as agents for entities such as National Multiple Employers Foundation and Association Life Insurance Company."[1] Apparently affiliated with CASCO in some way are the CASCO Insurance Trust Fund and its trustees, about whom the record tells us little else. CASCO placed the insurance with Association Life Insurance Company.

The insurance salesman from the O'Rourke firm filled in, and Wayne's president signed, an application for insurance addressed to Association Life. The printed application form included a section entitled "Employer Agreement and Subscription to Trust," which recited that Wayne "does hereby apply for Group Insurance Benefits set forth in the proposal dated 4–29–74 and subscribes to the Agreement and Declaration of Trust establishing the . . . Insurance Trust Fund." The proposal referred to is not in the record. No agreement and declaration of trust appears in the record, nor does it appear that Wayne was ever shown or ever signed such a document.

As evidence of the insurance, Wayne received a "certificate of insurance," which described the Trustees of the CASCO Insurance Trust Fund as the "policyholder," defined the "certificateholder" as the insured employee, and referred to Group Policy No. 1438, and in which "certain provisions of the Policy [were] summarized." Apparently neither Wayne nor its employees obtained copies of the policy.

### The Transfer to a New Carrier

The insurance continued with Association Life until July 1, 1975. Sometime earlier that year Wayne received an undated notice from CASCO bearing the salutation, "To our policyholders," which stated:

1. CASCO, according to its letterhead, is a division of Dennis Clark & Associates, Inc. It

appears in this action, however, in the name of Columbus Agency Service Corporation.

"We have been advised by the carrier of our CASCO Insurance program, the Association Life Insurance Company, that effective July 1, 1975, a rate increase of approximately 100% will be necessary. We wish to advise you that effective July 1, 1975, a new carrier with increased coverages will be made available for continuance of your coverages.

.    .    .    .    .

"We feel that the new plan will give you a much broader base of coverage and will be a part of a larger block of business; therefore, this should be a very distinct advantage in any cost calculations in the future. We will keep you advised as to the benefits of the new plan and the cost structure within the next ten days."

Subsequently Wayne received another undated notice from CASCO with the salutation, "To our policyholders," which stated:

"We are very pleased to announce that arrangements have been made to transfer your coverage to a new carrier. This coverage will be automatic as of July 1, 1975.

"You will notice that your attached premium statements for July are still on the old basis. Effective Aug. 1, 1975, we will have an increase in the health premium of approximately 12½%. Within a few weeks we will make available for you the option of maintaining your original plan with a few minor changes or a plan giving increased benefits. This has been a very monumental task and we want to thank you for your patience and understanding while these details have been worked out."

CASCO sent a copy of the latter notice to its agents with a separate notice advising the agents as follows:

"We are attaching a copy of the letter that was mailed to our policyholders with their July premium statements. We will have a plan very similar to their present coverage with a few minor changes. We will also have two other plans carrying increased benefits that will also be available through another carrier. We feel that by utilizing two different carriers that we can give you a better cross section of coverages than by using one carrier and one plan."

The O'Rourke firm received copies of the latter two notices.

All of these notices were presumably sent before July 1, 1975 and in any event before Thomas Tribolet's tragic accident on July 24 of that year. The last transition notice received by Wayne from CASCO bore the salutation, "Dear Policyholder," and stated as follows:

"As mentioned in our last letter to you, effective August 1 the rates for your group insurance have been increased. The new rates, as reflected on the accompanying billing, are 12½% higher than before but affect only the health portion of your statement. Also, because of increasing costs we have been forced to raise the administration charge slightly. We hope you understand the necessity of these increases and realize that we are doing our utmost to offer you the best available coverage at the lowest possible cost.

"There is also one change in your coverage which I think you will agree is an improvement. You now have a $100 calendar year deductible with a one-year accumulation period rather than a $50 deductible which had to be accumulated in 90 days. If you have any questions about this or any aspects of your coverage, please contact your agent who will be happy to answer them for you."

Neither Wayne nor the Tribolets were advised of the identity of the "new carrier" or of any adverse change in the terms of coverage until many months after the changeover. As late as November 5, 1975 Wayne, after having repeatedly requested copies of the new policy, received a letter from the O'Rourke firm stating as follows:

"Per our discussion, enclosed are several outlines of your group insurance coverage. The only changes made in the program from the previous coverage was the deductible. I am told that new certificates are currently at the printers."

The "outline" referred to in the letter said nothing about any changes in policy terms with respect to either continuation of coverage for an insured disabled at the time coverage would otherwise terminate or convertability at that time without evidence of insurability. It ultimately appeared, however, that the new coverage was, with respect to these matters, materially less advantageous to beneficiaries than the Association Life policy. This fact was first disclosed in late December 1975 when CASCO sent Wayne a pamphlet describing the new coverage.

The front cover of the pamphlet bears the title, "Comprehensive Major Medical Benefits," the name CASCO combined with the initials NMEF in a pictorial trademark, and the name National Multiple Employers Foundation. On the back cover appears the recital, "Plan Design and Administration by CASCO" and the name Columbus Agency Service Corporation. The inside of the cover bears the following legend:

CASCO NATIONAL MULTIPLE EMPLOYERS FOUNDATION

| THIS CERTIFICATE IS ISSUED TO | EFFECTIVE DATE | CERTIFICATE NUMBER |
|---|---|---|
| R. C. Tribolet | 6/1/74 | 005 |

PLAN DOCUMENT NUMBER 1438-36

EMPLOYER Wayne Chemical Company

IS A PARTICIPATING EMPLOYER IN THE CASCO IN-DUSTRY TRUST.

COVERAGE PROVIDED MAXIMUM $250,000.00 .

COMPREHENSIVE MAJOR MEDICAL BASED ON BENEFITS IN THE PARTICIPATION AGREEMENT ON FILE.

The record before us contains, in addition to the pamphlet just described, an unsigned document entitled "National Multiple Employers Foundation Plan and Trust Agreement" and dated January 1, 1975, which did not come to light until after this action was filed. Named as parties are NMEF, Nicholas J. Dolwett, and Lorraine Dolwett, the Dolwetts being designated as trustees. The document purports to establish a trust fund to be funded by "contributing employers," provides that the fund is to be administered "for the exclusive benefit of the participants in the plan, or their beneficiaries," and recites,

"The plan, the trust agreement and the Trust Fund created hereby are intended to comply with all the requirements of the Employee Retirement Income Security Act of 1974 as the same may be amended from time to time."

The provisions of the "plan" are not set forth.

Neither Wayne nor the Tribolets knew of this document, the parties to it, or the plan or trust fund which it purported to establish. As we have noted, the communications Wayne received from CASCO indicated that Wayne was CASCO's policyholder and that CASCO had merely shifted the insurance from one carrier to another. Wayne's president testified that not until 1976, after Wayne had engaged counsel, was it informed for the first time "that we did not have insurance but some other program which I frankly do not understand." He also testified that after the changeover Wayne continued to receive premium statements and to pay premiums as it had before: "We have operated as the initial major medical thing that we thought that we had."

### Authorization To Transact Insurance Business in Indiana

■ Transaction of insurance business in Indiana without a certificate of authority from the Commissioner of Insurance is forbidden, with certain exceptions. Ind.Code § 27–4–5–2(a).[2] It appears to be undisputed that, neither NMEF nor the trust created by the agreement just described had an Indiana certificate, and that unless they

---

**2.** One of the exceptions applies when a master policy for group sickness and accident insurance was lawfully issued and delivered in a state "in which the insurer was authorized to do an insurance business to a group organized for purposes other than the procurement of insurance, and where the policyholder is domiciled or otherwise has a bona fide situs." Ind. Code § 27–4–5–2(a)(5). This exception was apparently relied upon in connection with the insurance obtained from Association Life, which had been authorized to do business in Tennessee, where the CASCO Insurance Trust Fund claimed to have a bona fide situs, although it does not appear that the latter was organized for purposes other than the procurement of insurance.

were protected by the preemption provisions of ERISA, they were in violation of the Indiana unauthorized insurance statute.[3] When an unauthorized insurer defaults on an insurance contract subject to Indiana law, any person who assisted in the procurement of the insurance is liable on the coverage. Ind.Code § 27–4–5–2(c)(2).

*Purported Termination of Coverage*

Following Thomas C. Tribolet's accident, his hospital and medical bills were sent by Wayne to the O'Rourke firm, which in turn sent them to CASCO. Some of these bills were paid, apparently by NMEF, but the later ones were not. On December 23 CASCO notified the O'Rourke firm that Thomas' coverage would terminate when he reached age 19 on January 4, 1976 and that expenses incurred after that date would not be reimbursed. The O'Rourke firm so advised Wayne by letter dated December 31, 1975. Later, however, the date on which reimbursement for expenses was to terminate was extended to January 4, 1977 by a letter written by an attorney on behalf of NMEF. A protest by counsel retained by the Tribolets that the termination-of-coverage provision of the CASCO–NMEF insurance was in conflict with Ind.Code § 27–8–5–10(B)(4) was rejected by NMEF's attorney on the ground that ERISA preempted that state statute. NMEF is now, it is conceded, insolvent and unable to pay claims.

*This Action*

Plaintiffs initially brought this action in an Indiana state court against CASCO, which removed the case to the District Court on the ground of diversity of citizenship. NMEF, Nicholas J. Dolwett (designated as "Administrator"), and the O'Rourke firm were added as defendants after removal. Following an evidentiary hearing, the preliminary injunction described above was entered against CASCO, which is the only appellant.

CASCO's position on appeal is that the District Court properly held that ERISA preempted the Indiana insurance statute but erred in determining liability on the basis of federal common law. In CASCO's view, ERISA preempted Indiana regulation and that is the end of the matter. CASCO also argues that in any event the District Court should not have ordered it to prevent termination of insurance coverage or issue a conversion policy because it is impossible for CASCO to take such action. It is also argued that the injunction is void for vagueness, and that bond should have been required.

I.

This being an interlocutory appeal, our principal concern is whether it is probable that Thomas C. Tribolet will ultimately be entitled to the relief granted by the preliminary injunction. The other questions typically present in such an appeal, irreparable injury, etc., are not seriously in issue.

Because of the view we take of the case, it is unnecessary for us to reach the issue on which the District Court rested its decision, *viz.*, the rule to be adopted as federal common law when state regulatory statutes are preempted. We may, of course, affirm on any ground that finds support in the record. *Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Wright v. Heizer,* 560 F.2d 236 at 246 (7th Cir. 1977).

A.

The first issue is whether the provisions of the Indiana Insurance Code that would otherwise protect Thomas from termination of his benefits were preempted by § 514(a) of ERISA, 29 U.S.C. § 1144(a).[4] The an-

---

3. When questioned by the court at oral argument about why the Indiana unauthorized insurer statute did not apply, counsel for CASCO did not contend that NMEF or the NMEF trust met the requirements of that statute. He relied solely on ERISA's preemption provision.

4. Section 514(a) provides that, except as provided in § 514(b), the provisions of ERISA's Titles I ("Protection of Employee Benefit Rights") and IV ("Plan Termination Insurance")

swer, in our view, is negative if Wayne was not a participant in an "employee benefit plan" that issued the insurance in question, as the quoted term is defined in the Act. In that event the transaction remained subject to state regulation. If, on the other hand, Wayne was a participant in such a plan, the state laws, "insofar as they may . . . relate to the plan," were preempted, § 514(a). Although § 514(b)(2)(A) exempts state insurance regulation from preemption, that exemption is qualified by § 514(b)(2)(B), which states that an "employee benefit plan" is not "deemed to be an insurance company or other insurer." 29 U.S.C. § 1144(b)(2).[5]

The definition that controls this case appears in § 3(1) of the Act, 29 U.S.C. § 1002(1), which defines "employee welfare benefit plan," the kind of "employee benefit plan" alleged to be present, in this case.[6] To meet the definition, a plan must be "established or maintained by an employer or by an employee organization, or by

both," and even then it is such an "employee benefit plan" only "to the extent that [it] was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise" medical and hospital benefits.[7]

■ CASCO contends that "the National Multiple Employers Foundation Plan," presumably referring to the plan purportedly established by the unsigned "National Multiple Employers Foundation Plan and Trust Agreement," described above, was an "employee benefit plan" and that Wayne was a participant in that plan and maintained it by paying premiums. The District Court took the same view of the transaction, although, as we have noted, he went on to hold against CASCO on an unrelated ground.[8] The record contains no indication, however, that any plan or trust created by the unsigned agreement was ever involved in the Wayne insurance transaction.

---

"shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 4(a) and not exempt under section 4(b)." 88 Stat. 897 (1974).
Section 4(a) describes
"any employee benefit plan . . . established or maintained . . . by any employer . . . or . . . any employee organization . . . or both" (in-or-affecting-commerce qualifications omitted). 88 Stat. 839 (1974).
The exemptions of § 4(b), 88 Stat. 839–840 (1974), are not applicable in this case.

5. Section 514(b)(2):
"(A) Except as provided in subparagraph (B), nothing in this title shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking or securities.
"(B) Neither an employee benefit plan described in section 4(a), which is not exempt under section 4(b) (other than a plan established primarily for the purpose of providing death benefits), nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies." 88 Stat. 897 (1974).

6. The term "employee benefit plan" is defined in § 3(3) to mean either an "employee welfare benefit plan" or an "employee pension benefit plan" or a plan which is both. 88 Stat. 833 (1974). Inasmuch as no "employee pension benefit plan," defined in § 3(2), id., as having to do with pension benefits or retirement income for employees, is involved here, we need to be concerned only with the kind of "employee benefit plan" that is an "employee welfare benefit plan."

7. Section 3(1):
". . . any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, . . .." 88 Stat. 833 (1974).

8. Although the court spoke of "the plan in question here" without naming it, 426 F.Supp. at 320, we interpret the reference as being to the purported plan described in the text, and CASCO appears to do so also.

NMEF itself appears to have provided the insurance to Wayne, for it is the entity or organization that, with CASCO, is named in the pamphlet summarizing coverage and that dealt with the Tribolets when they asserted their claim. NMEF seems not to have been an "employee benefit plan," and CASCO does not argue that it was. We can perceive no plausible basis for treating insurance obtained for Wayne by CASCO from NMEF as covered by ERISA or as not subject to regulation by Indiana.

■ Even if we assume that the plan purportedly created by the agreement was the insurer, and also assume that the plan was maintained or established by employers[9] for the purpose of providing medical and hospital insurance rather than merely a proprietary insurance venture designed to take advantage of the void created by ERISA's preemption of state regulation,[10] the ERISA preemption provisions do not apply, because Wayne was not one of those employers. Wayne had no knowledge of the existence of such a plan or of NMEF until long after July 1975 and never entered into any agreement to establish any plan. Nor is there any basis in the record for CASCO's contention that Wayne designated CASCO to act as Wayne's agent for the purpose of bringing about participation by Wayne in a plan. See § 3(5), 29 U.S.C. § 1002(5). An employer does not become a participant in, or establish or maintain, a plan by applying for insurance and paying premiums for what it understands to be insurance without any knowledge that the plan exists. Establishing, maintaining, or participating in a plan requires an intent, which presupposes an awareness of the existence of the plan. Wayne was therefore not among the "participants" in the NMEF plan, if indeed there were any. That plan was an employee benefit plan, § 3(1) provides, only "to the extent" that it was maintained to provide "its participants or their beneficiaries" with insurance. If it provided insurance to Wayne, a nonparticipant, it was not acting as "an employee benefit plan," and the transaction was therefore not subject to preemption but was left by § 514(b)(2)(A) to regulation by Indiana law.

We find nothing in the legislative history of ERISA inconsistent with our interpretation of the establishment, maintenance, and participation requirements.[11] Congress would have had no reason to exempt from state regulation insurance programs that are established and maintained by entrepreneurs for their own profit. This conclusion is confirmed by a recent report of the House Committee on Education and Labor, which, after a description of entrepreneurial programs such as the one before us, contains the following statement:

"They are no more ERISA plans than is any other insurance policy sold to an employee benefit plan.

"To the extent that such programs fail to meet the definition of an 'employee benefit plan,' state regulation of them is not preempted by section 514, even though such state action is barred with respect to the plans which purchase these 'products.'

.    .    .    .    .

"We are mindful of the potentially harmful effects of an overly broad interpretation of the term employee benefit plan when coupled with the policy of section 514. As we have already noted, we do not believe that the statute and legislative history will support the inclu-

---

**9.** "Employer" is defined in § 3(5) to mean "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 88 Stat. 834 (1974).

**10.** As the program was held to be in *Bell v. Employee Security Benefit Association*, 437 F.Supp. 382 (D.Kan.1977). See also Activity Report of the Committee on Education and

Labor, H.R.Rep. No. 94–1785, 94th Cong., 2d Sess. 48 (1977), cited in the text, *infra*.

**11.** The question we decide appears not to have been addressed in the reports or the debates on ERISA. Therefore, no purpose would be served by a discussion of the legislative history, which has been reviewed elsewhere. See, e. g., *Hewlett-Packard Co. v. Barnes*, 425 F.Supp. 1294, 1298–1300 (N.D.Cal.1977).

sion of what amounts to commercial products within the umbrella of the definition. Where a plan is, in effect, an entrepreneurial venture, it is outside the policy of section 514 for reasons we have already stated. In short, to be properly characterized as an ERISA employee benefit plan, a plan must satisfy the definitional requirement of section 3(3) in both form and substance. We most earnestly encourage private persons, in particular the membership of the National Association of State Insurance Commissioners, and urge the Department of Labor, to ·take appropriate action to prevent the continued wrongful avoidance of proper state regulation by these entities."

Activity Report of the Committee on Education and Labor, H.R.Rep. No. 94–1785, 94th Cong., 2d Sess. 48 (1977).

■ CASCO does not contend that at the time of Thomas' accident the CASCO Insurance Trust was the employee benefit plan for purposes of ERISA. That contention would be unavailing for two reasons. First, Wayne never became a participant in that trust for the same reason it never became a participant in the NMEF plan: it had no knowledge of such a trust and was not a party to any agreement to establish, maintain, or participate in such a trust.[12] Thus, even if that trust was an employee benefit plan and it, rather than CASCO, had placed the insurance with NMEF, which does not appear to have been the case, NMEF would not have been thereby exempted by reason of ERISA, from state regulation. Second, the ERISA exemption of a plan does not extend to the insurer, as the House Committee report just referred to recognizes, or to an insurance policy purchased by the plan from an insurer, as the First Circuit has held in *Wadsworth v. Whaland*, 562

F.2d 70 (1st Cir. 1977). NMEF and insurance policies issued by it are therefore subject to state regulation whether or not the insurance was purchased by an employee benefit plan, and CASCO, which assisted in placing the insurance with NMEF, is subject to whatever consequences attach to that action under Indiana law.

### B.

Having concluded that the Indiana law governing the insurance transaction in issue here was not preempted by ERISA, we apply that law to the facts as they appear on the present record. The insurance was obtained from an unauthorized insurer acting in violation of Ind.Code § 27–4–5–2(a). When that insurer defaulted, CASCO, as a person who assisted in the procurement of the unauthorized insurance, is liable on the Tribolet claim under Ind.Code § 27–4–5–2(c)(2). The obligation that falls to CASCO, is defined by Ind.Code § 27–8–5–10(B)(4), which requires that a group hospital and medical policy providing for termination of coverage upon a dependent's reaching a given age must also provide that nevertheless coverage does not terminate

". . . while the child is and continues to be both (a) incapable of self-sustaining employment by reason of mental retardation or physical handicap and (b) chiefly dependent upon the employee or member for support and maintenance."

The NMEF policy that became effective on July 1, 1975 did not contain such a provision protecting a disabled dependent. The law will treat it as if it did and impose on CASCO the obligation to make good on the imputed provision.

For the foregoing reasons it appears probable that CASCO will ultimately be

---

12. We do not construe the "Employer Agreement and Subscription to Trust" which was a part of the application for insurance addressed to Association Life as such an agreement. The application form recites that the applicant "subscribes to the agreement and declaration of trust establishing the . . .. Insurance Trust Fund," but the fund is not named and no trust agreement appears to have ever been submitted to or signed by Wayne Chemical. Receipt by Wayne of the certificate of insurance issued by Association Life which showed "Trustees of the CASCO Insurance Trust Fund" as the "policyholder" could hardly constitute an agreement by Wayne to become a participant in an employee benefit plan. It is to be recalled also that the correspondence received by Wayne from CASCO about the change to a new carrier was addressed to "our policyholders."

held obligated to provide continuing hospital and medical coverage to Thomas C. Tribolet while he continues to be "both (a) incapable of self sustaining employment by reason of . . . physical handicap and (b) chiefly dependent upon the employee . . . for support and maintenance." Ind.Code § 27–8–5–10(B)(4). The preliminary injunction may properly enforce this obligation *pendente lite.*

## II.

CASCO also argues that it is unable to prevent coverage from terminating, as the preliminary injunction order now provides. This may be technically correct. The terms of the injunction order should be modified to reflect that CASCO is itself liable on the obligation to continue coverage and to enforce the obligation against CASCO *pendente lite.*

The Association Life certificate in force until July 1, 1975 provided that an insured, upon termination of his eligibility as a spouse or child of the employee-certificate-holder, could convert to an individual policy of medical insurance in the form then being issued by the company. The NMEF policy did not include such a conversion privilege. The District Court ordered CASCO to furnish a conversion policy.

Inasmuch as CASCO will be required by the preliminary injunction to provide the equivalent of continuing coverage, we see no need to reach the question of whether CASCO is also obligated to furnish a conversion policy and no need for the preliminary injunction to require that such a policy be made available. Whether the final judgment should include such a requirement will depend upon the consequences which Indiana law attaches to CASCO's representation to Wayne Chemical that the new coverage would be no less favorable than the coverage which it superseded on July 1, 1975. Determination of that question should await the merits. The order should be modified to delete the requirement that CASCO issue a conversion policy.

In view of our modification of the District Court's injunction, it is unnecessary to address the argument that the injunction, insofar as it ordered CASCO to obtain a conversion policy for Thomas Tribolet, was vague and failed to comply with Rule 65(d), Fed.R.Civ.P.

■ Finally, it was not error for the District Court to issue the preliminary injunction without a bond. Under appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c). *Scherr v. Volpe,* 466 F.2d 1027, 1035 (7th Cir. 1972). Indigence is such a circumstance. *Denny v. Health and Social Services Board,* 285 F.Supp. 526, 527 (E.D.Wis. 1968) (three-judge court); *Bass v. Richardson,* 338 F.Supp. 478, 490 (S.D.N.Y.1971). The injunction was in favor not of Wayne Chemical or Thomas' father, but of Thomas himself. His indigency, proved by the testimony of his mother, justified the court in excusing bond.

The order of the District Court is affirmed as modified.

**AFFIRMED AS MODIFIED.**