MICHIGAN UNITED FOOD AND COMMERCIAL WORKERS UNIONS and Food Employers Health and Welfare Fund, et al., Plaintiffs,

v.

Nancy A. BAERWALDT, Commissioner of Insurance of the State of Michigan, et al., Defendants.

Civ. A. No. 82–73821.

United States District Court, E.D. Michigan, S.D.

June 16, 1983.

As Amended Sept. 28, 1983.

Theodore Sachs, I. Mark Steckloff, Detroit, Mich., for plaintiffs.

Harry G. Iwasko Jr., William A. Chenoweth, Lansing, Mich., for defendants.

## OPINION

FEIKENS, Chief Judge.

This suit is before me on defendants' motion to dismiss the complaint and plaintiffs' motion for summary judgment. At issue here are questions of federal jurisdiction and ERISA[1] preemption.

## I. FACTUAL BACKGROUND

Plaintiffs are health and welfare benefit trust funds established under the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 186(c), and subject to ERISA.[2] Defendants are the Michigan Commissioner of Insurance, two deputy commissioners, and the Michigan Bureau of Insurance. Plaintiffs bring suit for declaratory and injunctive relief.

In 1980, the Michigan Insurance Code was amended by the addition of 1980 P.A. 429 (M.C.L.A. §§ 500.3425, 500.3609 and 500.3609a), which requires that all group disability insurance policies issued, delivered, or renewed in Michigan include a certain amount of coverage for substance abuse treatment. Although plaintiffs have obtained some coverage for substance abuse treatment in their existing policies, the coverage provided does not meet the requirements of the 1980 Act. Plaintiffs ask that the 1980 statute be declared unconstitutional as applied to them, and that defendants be enjoined from its enforcement.

Plaintiffs each have contracts with Occidental Life Insurance Company ("Occidental") providing that each fund will be liable for the payment of benefits to covered employees up to a maximum dollar amount. Once that amount has been exceeded, Occidental assumes responsibility for benefit payments. This arrangement is sometimes called a "stop-loss" plan. Occidental also administers the plans as agent for the funds.

No actions against either plaintiffs or Occidental have been brought by the Michigan Attorney General's Office.

## II. THE MOTIONS

Plaintiffs' summary judgment motion urges that 1980 P.A. 429 is preempted by ERISA, and is therefore unconstitutional under the Supremacy Clause of the Federal Constitution.[3] Plaintiffs also argue that even if ERISA does not preempt 1980 P.A. 429 when it is applied to benefit coverage provided by Occidental, it cannot be applied to that portion of plaintiffs' plans which is self insured.

Defendants' motion to dismiss has two principal components: First, they claim that federal subject matter jurisdiction has not been properly invoked. Second, defendants say plaintiffs have failed to state a claim because ERISA by its own terms saves the Michigan statute, which they say regulates insurance, from preemption.

Deciding the jurisdictional question first, I find that I may properly consider the complaint brought before me. On the merits, I hold that ERISA preempts 1980 P.A. 429 as applied to plaintiffs via their purchase of excess liability insurance from Occidental. My reasons for these holdings follow.

## III. THE JURISDICTIONAL QUESTION

■ Defendants assert that in bringing this action, plaintiffs cannot convert what would be a defense in a state suit into a ground for federal question jurisdiction. Thus, defendants say, plaintiffs have not properly pleaded jurisdiction in this court

---

1. The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*

2. 29 U.S.C. §§ 1002(1), (37), and 1003 provide for the plans' coverage.

3. At oral argument, plaintiffs also urged preemption by virtue of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*

pursuant to 28 U.S.C. §§ 1331 or 1337.[4] Both because I find the complaint in this suit is not a preemptive strike, and because I believe ERISA gives plaintiffs an independent basis for suit, I reject defendants' argument.

■ Federal question jurisdiction must be founded upon the allegations in a complaint, not on defenses to the action that might be raised. *Gully v. First National Bank,* 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936). Defendants properly observe that this rule should not be subverted by potential defendants enterprising enough to start a declaratory or injunctive lawsuit before they are sued. Thus, where there is a preemptive strike, courts do not look to the allegations of the complaint, but the nature of the threatened action. The United States Court of Appeals for the Sixth Circuit recognized this rule in *Michigan Savings & Loan League v. Francis,* 683 F.2d 957 (6th Cir.1982).

In *Francis,* the Sixth Circuit affirmed the lower court's dismissal of the action for lack of jurisdiction. *Francis* was brought by a group of federally chartered savings and loan associations which wanted to avoid being subject to Michigan's Mortgages Lending Act. Plaintiffs alleged the federal Home Owners Loan Act ("HOLA") preempted the Michigan statute. At the time they brought the action, plaintiffs had already been notified that they would be fined by Michigan's Commissioner for Financial Institutions. HOLA has no specific preemption language. Judge Keith, relying on *Public Service Commission v. Wycoff Company, Inc.,* 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952),[5] held that the federal right asserted was really in the nature of a defense to the imminent state court action, and that therefore federal question jurisdiction was lacking.

*Francis* is distinguishable from the instant case. First, the HOLA statute before Judge Keith and the ERISA statute before me are dissimilar, inasmuch as ERISA has express language of preemption, where HOLA does not. Second, in the *Francis* case, a state court suit against plaintiffs was in the offing. Here, no state court determination is being derailed; plaintiffs are not threatened with suit and are not even the potential defendants to such an action. It is Occidental which is the potential defendant. Because Occidental has chosen to avoid the risk of state prosecution under 1980 P.A. 429 by forcing plaintiffs to pay for increased substance abuse coverage, plaintiffs are in effect being saddled with what the consequences of a negative state court determination against Occidental would be, without having the opportunity to litigate their position.

Unlike the situation in *Public Service Commission v. Wycoff, supra,* fn. 4, this

---

**4.** 28 U.S.C. § 1331 provides: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States." 28 U.S.C. § 1337(a) provides in part: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . ." ERISA is "an Act of Congress regulating commerce." (See 29 U.S.C. § 1001(b), (c)). If the suit before me "arises under" ERISA, therefore, jurisdiction is conferred by either 28 U.S.C. §§ 1331 or 1337(a).

**5.** In *Wycoff,* the Supreme Court held that a company in the business of distributing films within and outside the State of Utah could obtain neither a declaration that its transportation of films within Utah was in furtherance of interstate commerce, nor an injunction preventing Utah's Public Service Commission from interfering with their film distribution. Observing that no state suit had yet been launched, the Court emphasized that the controversy was not ripe for review, and that no showing of irreparable harm had been made. The Court also observed as a general proposition:

> Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is a federal question jurisdiction. . . . If the cause of action, which the declaratory defendant threatens to assert, does not itself involve a claim under federal law, it is doubtful if a federal court may entertain an action for a declaratory judgment establishing a defense to that claim.

*Id.* at 248, 73 S.Ct. at 242.

controversy is ripe for review. Where, as here, plaintiffs base their complaint for both declaratory and injunctive relief from a state statute upon a claim of federal preemption, I hold that plaintiffs are seeking to vindicate a federal right, not just ward off a state suit. *See Stone & Webster Engineering Corporation v. Ilsley,* 690 F.2d 323 (2d Cir.1982). They therefore have properly pleaded federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337.

I also hold that plaintiffs have standing,[6] and have alleged a valid alternative source of jurisdiction. ERISA states that a civil action may be brought

> by a participant, beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provisions of this subchapter or the terms of the plan ... 29 U.S.C. § 1132(a)(3),

and that

> [T] district courts of the United States shall have jurisdiction, without respect to the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action. 29 U.S.C. § 1132(f).

Defendant challenges the applicability of this ERISA provision, saying plaintiff employee benefit plans are not "participants," "beneficiaries" or "fiduciaries" under its language.

I do not read the quoted provision in such a limiting manner. While participants, beneficiaries, and fiduciaries who might otherwise not clearly have standing to bring suit in federal court to enjoin violations of the Act are the only parties addressed, I do not believe the provision's language should be read to exclude a non-fiduciary plan

itself from suing for an injunction, and obtaining federal jurisdiction by presenting a question arising under ERISA. ERISA § 1132(d)(1) buttresses the plan's standing. It provides: "an employee benefit plan may sue or be sued under this subchapter as an entity." Although this later provision does not confer federal jurisdiction, and does not define the types of suits which may be brought by a plaintiff plan, I read it, together with § 1132 and ERISA's clear legislative preemption mandate, to sanction the type of suit brought before me.[7]

## IV. ERISA PREEMPTION

Three ERISA clauses are the battleground for the parties' preemption dispute. They are commonly known as: (1) the preemption clause; (2) the "saving" clause; and (3) the "deemer" clause. In order, they provide as follows:

1. *Preemption Clause*

Except as provided in subsection (b) of this section, the provisions of this subchapter ... shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) ... and not exempt under section 1003(b) .... 29 U.S.C. § 1144(a).

2. *Saving Clause*

Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities. 29 U.S.C. § 1144(b)(2)(A).

3. *Deemer Clause*

(B) Neither an employee benefit plan described in section 1003(a) of this title, which is not exempt under section 1003(b) of this title (other than a plan established primarily for the purpose of providing

---

**6.** This discussion addresses the jurisdictional issue as argued and briefed, notwithstanding the entry of an April 11, 1983 stipulation and order adding the plans' trustees as parties which may have mooted the following points.

**7.** My conclusion is consistent with that reached by the United States Court of Appeals for the Ninth Circuit in *Fentron Industries, Inc. v. Na-*

*tional Shopmen Pension Fund,* 674 F.2d 1300 (9th Cir.1982). The court in *Fentron* specifically found that an employer had standing to assert its claim under ERISA, despite § 1132(e)(1)'s omission of "employers" from the list of those with standing to sue under ERISA.

death benefits), nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State, purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.[8] 29 U.S.C. § 1144(b)(2)(B).

Defendants' position is that even if 1980 P.A. 429 "relates to" an employee benefit plan so as to come under the broad preemption of the preemption clause, the statute is "saved" by the clause which excepts laws regulating insurance from invalidity. Plaintiffs read the deemer clause to prevent employee benefit plans from being regulated as if they were insurance companies, but do *not* read it to preclude even indirect effects of insurance laws. Primarily, defendants see the deemer clause as preventing employee benefit plans from being saddled with the regulations insurance companies are prey to; the deemer clause does not, in defendants' view, make employee benefit plans into a special class of customer for insurance companies. As additional authority, defendants cite the McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.,* which states in part "No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such act specifically relates to the business of insurance ..." 15 U.S.C. § 1012(b). ERISA § 1144(d) provides that ERISA does not modify or supersede any other federal law.

Plaintiffs' position is that enforcement of the 1980 Act would regulate the terms and conditions of plaintiffs' plans. Plaintiffs assert that neither direct nor indirect regulation is permissible. They read the deemer clause as making clear that states cannot

prescribe plan terms in the guise of regulating insurance. Plaintiffs point out that if the deemer, saving, and preemption clauses allow for an act like 1980 P.A. 429, then the only option for plans hoping to avoid mandatory forms of coverage imposed by states would be to be self insured. Plans would then differ in the requirements made of them by virtue of their capacity to self insure. This would defeat ERISA's goal of uniform standards applicable to all employee benefit plans.

As a final point, plaintiffs say that even if 1980 P.A. 429 is permissible when invoked against an insurance company which offers group life coverage to an ERISA plan, it should not apply to a self-insured plan. They characterize their stop-loss coverage as being, in effect, self insurance up to the maximum loss figure when Occidental begins to assume coverage. Because of my holding in this case, I do not reach this last issue.

## V. ANALYSIS

■ I agree with plaintiffs' view that the statute in question impermissibly dictates the terms and conditions of an employee benefit plan. I believe that ERISA was intended to insulate multi-employer welfare benefit plans formed pursuant to collective bargaining agreements from any state laws that might prescribe the benefits they are to afford. Although the broad stroke of § 1144's preemption clause is modified by the saving clause's caveat that "nothing in this title shall be construed to exempt or relieve any person[9] from any law of any state which regulates insurance, banking, or securities," I do not think that clause was aimed at preserving state statutes which more than tangentially affect employee benefit plans.

---

**8.** Also relevant to the preemption issue are the recent amendments to Section 1144, which will be discussed *infra.* Neither party cited these amendments in its briefs.

**9.** "Person" is defined in ERISA as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, es-

tate, unincorporated organization, association, or employee organization." 29 U.S.C. § 1002(9). I note that the meaning of "trust" in this list is somewhat ambiguous, and I have some doubt as to whether the employee benefit plans before me were meant to fall within the definition of "person" at all.

ERISA's language and legislative history make clear that it was enacted to help insure employees a certain modicum of security in the expectation of benefits they held from private pension and welfare plans. It is also apparent that ERISA was carefully devised to insure that the regulations it imposed upon employee pension and benefit plans would not strangle the growth of these plans.[10] Implicit in the whole purpose of the Act is a desire to encourage private pension and welfare plans by promulgating uniform, reasonable, and non-oppressive federal requirements.

■ In my view, this nurturant attitude towards private plans must be carefully considered in determining the preemption issue before me. Preemption of a state statute is demanded by the Supremacy Clause of the United States Constitution (Art. VI, Cl. 2) where state and federal laws are inconsistent. A state law need not directly contradict a federal statute to be preempted; state laws which impinge on an area carved out by Congress as an exclusive federal domain are unenforceable as well. *Fidelity Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982); *Malone v. White Motor Corp.,* 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978); *Kapuscinski v. Plan Administrator, et al.,* 658 F.2d 427 (6th Cir. 1981); *Carpenters Pension Trust for Southern California v. Kronschnabel,* 460 F.Supp. 978 (C.D.Cal.1978), *aff'd* 632 F.2d 745 (9th Cir.1980). By generally disallowing state regulations that might enhance protections for employees within any particular state, Congress was making a judgment that the greater national good called for both a min-

---

10. In its synopsis of ERISA's purposes, the House Committee on Education and Labor (hereinafter "House Committee") observed:

> The Employee Benefit Security Act as reported by the Committee is designed to remedy certain defects in the private retirement system which limit the effectiveness of the system in providing retirement income security. The primary purpose of the bill is the protection of individual pension rights, but the committee has been constrained to recognize the voluntary nature of private retirement plans. The relative improvements required by this Act have been weighed against the additional burdens to be placed on the system. While modest cost increases are to be anticipated when the Act becomes effective, the adverse impact of these increases have been minimized. Additionally, all of the provisions in the Act have been analyzed on the basis of their projected costs in relation to the anticipated benefit to the employee participant. In broad outline, the bill is designed to:
> (1) establish equitable standards of plan administration;
> (2) mandate minimum standards of plan design with respect to the vesting of plan benefits;
> (3) require minimum standards of fiscal responsibility by requiring the amortization of unfunded liabilities;
> (4) insure the vested portion of unfunded liabilities against the risk of premature plan termination; and
> (5) promote a renewed expansion of private retirement plans and increase the number of participants receiving private retirement benefits.

H.R.Rep. No. 533, 93 Cong., 2d Sess. (hereinafter "House Report"), reprinted in 1974 U.S. Code Cong. & Ad.News 4639–40, continues:

> The Committee believes that the legislative approach of establishing minimum standards and safeguards for private pensions is not only consistent with retention of the freedom of decision-making vital to pension plans, but in furtherance of the growth and development of the private pension system. At the same time, the Committee recognizes the absolute need that safeguards for plan participants be sufficiently adequate and effective to prevent the numerous inequities to workers under plans which have resulted in tragic hardship to so many.
> The Bill reported by the Committee represents an effort to strike an appropriate balance between the interests of employers and labor organizations in maintaining flexibility in the design and operation of their pension programs, and the need of the workers for a level of protection which will adequately protect their rights and just expectations. In adopting this approach, the Committee believes it has designed a bill, which, like the National Labor Relations Act, the wage-hour laws and other labor standards laws, brings the workers' interests up to parity with those of employers. This legislation strikes an appropriate and equitable balance between two opposing schools of thought—those who advocate complete and stringent control of private pensions and those who oppose any form of government supervisory or regulatory control.

House Report, Op. Cit., at 4647.

imum and maximum on the regulation of employee benefit plans.[11]

Informed as I am by the general intent of ERISA, I would construe the saving and deemer clauses differently than some of my fellow judges have done.[12] Certain other courts, when faced with statutes denominated insurance regulations, have been loath to allow preemption when these statutes were applied against an insurance company, rather than directly against a plan.

In *Wadsworth v. Whaland*, 562 F.2d 70 (1st Cir.1977), for example, the First Circuit held that a New Hampshire statute requiring all group health insurance policy issuers to provide policy coverage for mental illness was not preempted.[13] Plaintiffs in *Wadsworth* had contended that the statute "impermissibly regulate[d] employee benefit plans by indirectly regulating the content of the group insurance policies which the funds purchase, and that ERISA preempt[ed] any state regulation of employee benefit plans. The State of New Hampshire respond[ed] that ERISA was not intended to preempt any state law unless that law directly conflict[ed] with or duplicate[d] the regulatory provisions of ERISA." *Id.* at 76.

Rejecting plaintiff's argument, the court in *Wadsworth* construed the deemer clause as prohibiting only the *direct* regulation of an employee benefit plan as an insurance company, and found that the saving clause would be meaningless without including the New Hampshire statute under its protection. I disagree.

Unlike the court in *Wadsworth,* I do not view the saving and deemer clauses as preserving a back door approach to control of a plan's terms and conditions through "indirect" regulation. If Congress had meant for the deemer clause to have such consequences, it would have used more specific language.[14] Furthermore, the distinction between direct versus indirect regulation has been rejected, albeit in cases not involving the saving and deemer clauses but only the preemption clause, by the Supreme Court and the Court of Appeals for the

---

**11.** Discussing preemption, Congressman Dent said in the final House debate on the Bill, "I wish to make note of what is to many *the crowning achievement of this legislation, the reservation to Federal authority of the sole power to regulate the field of employee benefit plans.* With the preemption of the field, we round out the protection afforded participants by eliminating the threat of conflicting and inconsistent State and local regulation." 120 Cong.Rec. (HR) 29197 (August 20, 1974) (emphasis supplied), *quoted in General Motors Corp. v. Buha,* 623 F.2d 455, 459 (6th Cir.1980). This was not the case when the Supreme Court considered the preemptive effect of the federal Welfare and Pensions Plan Disclosure Act (superseded) in *Malone v. White Motor Corp.,* 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978). There, the Court refused to find that that statute, ERISA's predecessor, and the NLRA preempted state regulation of pension plans. Instead, the Court pointed to language in the legislative history of that Act which indicated Congress "envisioned the exercise of state regulation over pension funds." 435 U.S. 497, 512, 98 S.Ct. 1185, 1194, 55 L.Ed.2d 443. The court in *Malone* noted, however, that Congress "came to a quite different conclusion" where ERISA was concerned. According to the Court's dicta, ERISA was enacted largely in response to perceived inadequacies in the prior scheme.

**12.** I come to the saving clause directly, rather than discussing the preemption clause at length, because I think it is clear that 1980 P.A. 429 "relates to" an employee welfare benefit plan, and is thus preempted *unless* it falls under the enumerated exceptions of the saving clause. As the Court of Appeals for the Second Circuit observed in *Stone & Webster Engineering Corp. v. Ilsley, supra,* "A state law 'relates to' an employee benefit plan and is subject to preemption whenever it 'purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans.'" *Id.* at 329, *quoting* from 29 U.S.C. § 1144(c)(2). I note that defendants all but conceded the relatedness of the statute in question in their brief.

**13.** *See also Attorney General v. Travelers Insurance Co.,* 385 Mass. 598, 433 N.E.2d 1223 (1982); *cf. General Split Corp. v. Mitchell,* 523 F.Supp. 427, 431 (E.D.Wis.1981); and *Russo v. Boland,* 103 Ill.App.3d 905, 59 Ill.Dec. 537, 431 N.E.2d 1294 (1982).

**14.** In the 1983 Amendments to § 1144, in fact, Congress does distinguish between some fully insured and non-fully insured plans, but its distinction does not affect plans like the one before me.

Sixth Circuit.[15] There are sound public policy reasons for rejecting the distinction. As the court in *Metropolitan Life Insurance Company v. Insurance Comm'r,* 51 Md.App. 122, 441 A.2d 1098 (Spec.App.1982), noted:

Although it was the clear intent of the Congress not to interfere in the regulation of insurance by the states, we see no intent to extend that policy to permitting state regulation of the terms and conditions of employee benefit plans. [One article treating the subject] observes:

If states are permitted to require employee benefit plans to provide substantive benefits under the guise of insurance regulation, the result may be a Hobson's choice for employer or labor and management negotiators; either abandon the funding of benefit plans through insurance policies or be willing to accept all-encompassing uniform national contracts. For, if each state may impose its own substantive terms on the plan, the only way uniformity may be reached is by incorporating into the plan all of the benefits each state requires. This dilemma is clearly of the type that Congress sought to avoid by enacting ERISA's preemption provisions, which were formulated to relieve interstate employee benefit plans of the adverse effects of cumulative or inconsistent state regulation.

*Id.* 441 A.2d at 1103, *quoting* Hutchinson and Ifshin, *Federal Preemption of State Law Under the Employee Retirement Income Security Act of 1974,* 46 Chicago L.Rev. 23, 68–69 (1978).

Looking at the saving clause as a whole, I find that its purpose was to avoid unintended and wholesale preemption of important fields of state concern by making clear that statutes only incidentally affecting employee benefit plans, but not regulating their terms and conditions, were not to be ousted. In other words, ERISA's preemption clause was not meant to sweep up within it a whole range of state laws that were or could arguably be related to employee benefit plans, but were actually addressed to maintaining state control over three areas of its traditional power: banking, securities regulation, and the regulation of insurance.

The saving clause may preserve the state's power to regulate certain types of institutions important to the fabric of state life, and generally excluded from federal regulation, but I would confine the term "regulates insurance" so as to exclude laws which do not so much monitor the insurance industry as its customers from the clause's protection.[16] As the House Committee on Labor and Education observed in a report prepared pursuant to its oversight responsibility for ERISA:

The provisions of Section [1144] expressly reserve to federal authority the regulation of employee benefit plans subject to the jurisdiction of the Act. In electing deliberately to preclude State authority over these plans, Congress acted to insure uniformity of regulation with respect to their activities. There was a recognition of the necessity for the preservation of some State activity in this field and certain limited exceptions were made to the broad preemption scheme. *In general these exemptions are designed to save State law as it applies to entities which are not employee benefit plans as defined in Section [1003(a)] and not exempt un-*

---

**15.** In *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981), the Supreme Court struck down a New Jersey statute prohibiting employers from setting off workers' compensation awards in their provision of pension benefits. The Court found that Congress meant to preempt the field of pension plan regulation when it adopted ERISA. The New Jersey statute, although called a worker's compensation law rather than a pension plan regulation, could not escape preemption. "ER-ISA's authors clearly meant to preclude the States from avoiding through form the substance of the preemption provision." *Id.* at 525, 101 S.Ct. at 1907. "It is of no moment that New Jersey intrudes indirectly ... rather than directly." *Id. See also Kapuscinski v. Plan Administrator,* 658 F.2d 427 (6th Cir. 1981).

**16.** By doing so, I believe I strike the correct balance between the McCarran-Ferguson Act and ERISA.

*der Section [1003(b)], to the extent that such regulation does not relate to employee benefit plans.* ACTIVITY REPORT OF THE COMMITTEE ON EDUCATION AND LABOR OF THE U.S. HOUSE OF REPRESENTATIVES, House Report No. 94–1785, pp. 46–47 (1/3/77), *quoted in Bell v. Employee Security Benefit Ass'n,* 437 F.Supp. 382, 387 (D.Kan.1977). (Emphasis added.)

Not every statute designated an insurance law should come within the exception carved out by Congress to ERISA's broad preemption. There are laws, however, which are more than just nominally insurance regulations. Laws which increase the cost of doing business for an insurance company may relate to or affect a plan but yet be unimpeachable because they do in fact "regulate insurance" and only tangentially affect plans; with non-preemption of such laws I would have no quarrel.

■ My view is supported by a reading of the saving clause in tandem with the deemer clause. I consider the deemer clause to have two main purposes. First, the clause makes clear that employee benefit plans should not be viewed as the equivalents of insurance companies, securities firms, or banks simply because they might serve some of the same functions for their beneficiaries. They are thus not subject to the same kind of *institution qua institution* regulations. Second, the clause prevents the above-mentioned institutions from "masquerading" as employee benefit plans, and thus avoiding state regulations having nothing directly to do with ERISA or the private pension and welfare benefit system. *See,* for example, *Hamberlin v. VIP Insurance Trust,* 434 F.Supp. 1196 (D.Ariz.1977); *Wayne Chemical Inc. v. Columbus Agency Service Corporation,* 567 F.2d 692 (7th Cir. 1977).

Congress' newly enacted legislation also bolsters my conviction that the types of plans plaintiffs represent are immune from the permissible regulation of insurance left open by the saving clause.

Section 1144 now includes the following language:

(6)(A) Notwithstanding any other provision of this section—

(i) in the case of an employee welfare benefit plan which is a multiple employer welfare arrangement and is fully insured . . . any law of any State which regulates insurance may apply to such arrangement to the extent that such law provides—

(I) standards, requiring the maintenance of specified levels of reserves and specified levels of contributions . . . and

(II) provisions to enforce such standards, and

(ii) in the case of any other employee welfare benefit plan which is a multiple employer welfare arrangement, . . . any law of any State which regulates insurance may apply to the extent not inconsistent with the preceding sections of this subchapter . . .

(C) Nothing in subparagraph (A) shall affect the manner or extent to which the provisions of this subchapter apply to an employee welfare benefit plan which is not a multiple employer welfare arrangement and which is a plan, fund, or program participating in, subscribing to, or otherwise using a multiple employer welfare arrangement to fund or administer benefits to such plan's participants and beneficiaries . . .

At first blush, this new language might seem to support the rationale of cases finding against preemption when a statute has a direct coercive effect only upon an insurance company, but not a plan.[17] Fully insured multi-employer welfare arrangements are treated differently from non-fully insured arrangements under the § 1144 amendments. The fully insured arrangements are specifically subject to a range of state laws presumably narrower than those provided in the saving clause, whereas the non-fully insured arrangements are subject to any state laws which "regulate insur-

**17.** *See* n. 13, *supra.*

ance," unless the Secretary exempts them from coverage. What constitutes regulation of insurance is not more clearly defined than in the original language of § 1144, leaving open the possibility that statutes affecting terms and conditions of multi-employer welfare benefit "arrangements" might be "saved" from preemption.

Nevertheless, I read the new statutory language to support plaintiffs' position. In an amendment to the definitional section of the Act, "multi-employer benefit arrangement" is defined in pertinent part as:

[A]n employee welfare benefit plan, or any other arrangement (other than an employee welfare benefit plan), which is established or maintained for the purpose of offering or providing any benefit described in paragraph (1)[18] to the employees of two or more employers (including one or more self-employed individuals), or to their beneficiaries, except that such term does not include any such plan or other arrangement which is established or maintained—

(i) under or pursuant to one or more agreements which the Secretary finds to be collective bargaining agreements . . . 29 U.S.C. § 1002(40)(A).

By contrast, a "multi-employer plan" is defined as one:

(i) to which more than one employer is required to contribute,

(ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and

(iii) which satisfies such other requirements as the Secretary may prescribe by regulation. 29 U.S.C. § 1002(37)(A).

Thus, plans like plaintiffs' which were established pursuant to a collective bargaining agreement form a separate class, treated differently under the Act. The new statutory language affecting multi-employer benefit plans *not* formed pursuant to a collective bargaining agreement does not reach the plans before me.

Congress had good reason for differentiating between plans which conform to a collective bargaining agreement and those which do not. First, the benefits under plans formed as a result of collective bargaining express the finely tuned give and take of the negotiating process. Second, such plans embody the goals of the NLRA, a federal statute which in and of itself has preemptive effect. As the Supreme Court observed in *Alessi v. Raybestos-Manhattan, Inc., supra,* "Employee benefit plan terms themselves become expressions of federal law, requiring preemption of intrusive state law." *Id.* 451 U.S. at 536, 101 S.Ct. at 1913.

The fact that the state law in question reflects the benign public policy of alleviating alcohol and drug dependence is not enough to allow evisceration of the agreement embodied in the employee benefit plans before me.[19] As one court observed, "Ordinarily, preemption depends upon the effect of State law upon NLRA policy, and the fact that a State law is enacted for neutral purposes and applies outside the employment relationship cannot save it from preemption." *Attorney General v. Travelers Insurance Co.,* 385 Mass. 598, 433 N.E.2d 1223 (1982) 433 N.E.2d at 1231–1232.[20] Public Act 429 of 1980 disturbs a

---

**18.** 29 U.S.C. § 1002(1).

**19.** *Cf. Local 24, International Board of Teamsters v. Oliver,* 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959), where the Supreme Court held that Ohio's antitrust law was preempted insofar as it interfered with a collectively bargained wage agreement, but also noted that the statute before it was not a "local health or safety regulation." *Id.* at 297, 79 S.Ct. at 305. 1980 P.A. 429 is not, in my estimation, the type of "local health or safety regulation" which the *Oliver* court expressed doubt about preempting. It is not a regulation designed to deal with

emergency situations and imminent threats to public health, which are so peculiarly within the police power of the state to address. Thus, I view *Oliver* as supporting preemption under the NLRA.

**20.** In *Attorney General v. Travelers Insurance Co., supra,* the Supreme Court of Massachusetts found no preemption when faced with a similar statute. The Court relied upon three grounds for rejecting preemption: first, it found that the state law in question was of special local concern, and was not the type of law Congress contemplated preempting under

mandatory subject of collective bargaining; namely, the provision of health benefits. Because of its effect, it must be preempted.[21]

For the reasons stated above, I hold that 1980 P.A. 429 is preempted as it applies to multi-employer welfare benefit plans subject to ERISA, and that the State of Michigan is permanently enjoined from its enforcement against such plans.

An appropriate order may be submitted.

the NLRA; second, as a state regulation of insurance, the law came under the protection of the McCarran-Ferguson Act, *supra,* "which establishes a congressional policy in favor of State regulation of insurance," *id.* 433 N.E.2d at 1232; and finally, the statute did not directly prohibit plans from retaining the level of health benefits they had contemplated, but only imposed different benefits upon plans which sought insurance. I reject all three reasons offered against preemption. First, as I have already noted, I distinguish the type of statute before me from the type of health and public safety law the *Oliver* court recognized might not be preempted. Second, I read the McCarran-Ferguson Act, which provides for state regulation of the "business of insurance" to apply to a narrower range of state activity when read in light of ERISA. Third, I do not believe plans entered into as a result of collective bargaining should be presented with the dilemma of choosing between acquisition of insurance, and maintenance of their agreed-upon terms and conditions.

21. Preemption by virtue of the NLRA provides an alternative basis for my holding in this case. Because the NLRA issue was raised only at oral argument, and not in plaintiffs' brief, defendants may feel disadvantaged inasmuch as they did not have a full opportunity to research NLRA preemption. Any disadvantage defendants may have suffered in presenting such an argument is of no consequence, however, because my decision to preempt stands equally upon ERISA's mandate.