In re WHITE FARM EQUIPMENT
COMPANY, Debtor.

Douglas J. HANSEN, Raymond Borrell,
Louis P. Ellery, Anthony G. Obermeier,
Pearl C. Lindahl, and Lenor Knutson,
on behalf of themselves and all others
similarly situated, Plaintiffs-Appel-
lants,

v.

WHITE FARM EQUIPMENT COMPANY,
T.I.C. Investment Corporation, White
Motor Corporation, White Motor Cor-
poration Insurance Plan for Salaried
Employees, and The Equitable Life As-
surance Society of the United States,
Defendants-Appellees.

Civ. A. No. C82–3209.

United States District Court,
N.D. Ohio, E.D.

Sept. 20, 1984.

Russell C. Brown, Stolpestad, Brown & Smith, Saint Paul, Minn., for plaintiffs-appellants.

Robin E. Phelan, Haynes & Boone, Dallas, Tex., for defendants-appellees.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Retired employees and spouses of deceased retired employees ("the retirees") of White Farm Equipment Company ("White Farm"), formerly a reorganizing entity under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.*, commenced an action seeking retroactive reinstatement of health and welfare benefits which were terminated by White Farm's successor. The Bankruptcy Court granted summary judgment to White Farm and the other defendants and dismissed the complaint. 23 B.R. 85. On appeal, this Court reverses.

The District Court's appellate jurisdiction rests on 28 U.S.C. § 158 [1], as enacted by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98-353, 98 Stat. 333. Since Fed.R.Civ.P. 56(c) [2] applies to adversary bankruptcy proceedings under Bankruptcy Rule 7056, an appellate court "must therefore view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact existed ...", *Hasan v. CleveTrust Realty Investors,* 729 F.2d 372, 374 (6th Cir.1984), and affirm only if the moving party was entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

**1.** Title 28 U.S.C. § 158 provides in pertinent part:

> (a) The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.
>
> *       *       *       *       *       *
>
> (c) An appeal under subsection[ ] (a) ... of this section shall be taken in the same manner

as appeals in civil proceedings generally are taken to the courts of appeals from the district courts and in the time provided by Rule 8002 of the Bankruptcy Rules.

**2.** Fed.R.Civ.P. 56(c) provides that summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

**3.** These terms define a plan under which benefits are funded solely by the employer. The employees do not contribute.

## I. FACTUAL BACKGROUND

### A. *The Benefit Plans*

The retirees were employed by White Farm while the company was an affiliate of the White Motor Corporation ("White Motor"). This dispute concerns the White Motor Corporation Insurance Plan for Salary Employees ("Welfare Benefit Plan" or "the Plan"), a non-funded, non-contributory benefit plan [3] which provided life, health and welfare insurance, prescription drugs, hearing aid benefits and dental care to retirees and their eligible dependents; it included predecessor plans extending benefits to employees or corporations acquired by White Farm. White Motor served as Plan Administrator, Agent for Service of Legal Process, and the Plan Sponsor. The Equitable Life Assurance Society of the United States ("Equitable") was the insurer of the Plan; White Motor, as self-insurer, was an additional insurer under the Prescription drug portion of the Plan. White Motor also sponsored, and Equitable served as insurer of, the White Motor Corporation Pension Plan for Salary Employees ("Pension Plan"), a funded defined benefit plan administered by a committee and trustee. The Pension Plan is not at issue in this case.

The formal documents containing the actual terms of the Welfare Benefit Plan are not part of the record, despite the retirees' efforts to obtain copies of them during the abbreviated discovery permitted by the Bankruptcy Court. Instead, available information concerning the Plan derives solely from printed materials and booklets dis-

tributed by White Farm to its employees from 1970 through 1978. These include two booklets entitled "Your Group Insurance Plan," dated June 1, 1970 ("1970 Booklets"), and "Benefits After Retirement for Salary Retirees," dated January of 1978 ("1978 Booklet").

The 1970 Booklets describe insurance provided by Equitable and carry the explicit disclaimer that they are "not the contract of insurance." [4] The booklets discuss life, health, and welfare insurance. They differentiate between different categories of salaried employees and appear to have been prepared for distribution to both active and retired employees. The booklets link benefits to continuing employment, explain the effect of a termination of employment, and distinguish between benefits "before your retirement" and "after your retirement."

The 1978 Booklet is addressed specifically to retired employees. It too summarizes formal documents containing the controlling benefit provisions, and carries a disclaimer similar to the one in the 1970 Booklets.[5] The booklet describes both the Welfare Benefit Plan and the Pension Plan; its table of contents is divided into three substantive categories, "Pension", "Life Insurance", and "Health Care". Much of the information in the booklet makes no distinction between the Welfare Benefit Plan and the Pension Plan, and its summary of an alleged cancellation clause refers to both plans:

> The Company fully intends to continue your plans indefinitely. However, the Company does reserve the right to change the Plans, and, if necessary, discontinue them. If it is necessary to discontinue the Pension Plan, the assets of the Pension Fund will be used to provide benefits according to the Plan document.

No similar clause appears in the 1970 Booklets.

### B. *The Bankruptcy*

White Motor filed for reorganization on September 4, 1980. White Farm also petitioned for, and was granted, bankruptcy court protection and status as a debtor-in-possession. On December 19, 1980, White Motor sold White Farm to White Farm USA, Inc., a wholly-owned subsidiary of T.I.C. Investment Corporation ("TIC"). TIC entered into an agreement with White Motor entitled "Assignment and Assumption of Liabilities," under which TIC assumed White Motor's obligations to White Farm employees and retirees under the Welfare Benefit Plan.

In a letter dated December 19, 1980, the president of White Farm, R.E. Kidder, assured the retirees that their benefits would continue.[6] However, four months later, on

---

**4.** The disclaimer states:

> This certificate, which is furnished in accordance with, and subject to, the terms of the Group policy(ies), replaces any other certificate previously issued to you covering the insurance described herein. It is not the contract of insurance. Each policy and the application of the Employer for it constitute the entire contract. This certificate is merely evidence of insurance provided under the policy(ies).

1970 Booklets at 3.

**5.** The preface to the 1978 Booklet states in pertinent part:

> This is a summary of the Benefit Plans written in informal language for the convenience of you, your relatives and beneficiaries in referring to the various provisions. The formal documents will govern in all cases of conflict. You are welcome to examine the actual text of the Plans by making the necessary arrangements through the representative at the location from which you were retired or through the PLAN ADMINISTRATOR listed

in the section titled INFORMATION RELATED TO THE RETIREMENT INCOME SECURITY ACT OF 1974 (ERISA).

**6.** The letter stated:

> Dear White Farm Equipment Retiree:
>
> We are pleased to advise you that White Farm Equipment has been purchased by TIC Investment Corporation, a privately held company based in Dallas, Texas. We will continue in operation as White Farm Equipment. We intend that under the new ownership, supported by our dealer organization and loyal employees, our White Farm product line will grow as a competitive force in the marketplace.
>
> Secured by this growth and our continued operation, your retirement benefits will continue. Accordingly, your pension payments will also continue on a timely basis.
>
> If there are any problems or questions regarding your pension or insurance, they should be addressed to the White Farm location which has administered these benefits for you in the past.

March 31, 1981, White Farm sent the retirees a second letter, announcing that all non-contributory retiree insurance would be terminated on May 1, 1981. Penned by Robert A. Fuller, the executive vice president and chief operating officer, the letter stated in part:

Dear Retiree:

As I'm sure you know, White Farm Equipment Company has been through some very difficult and uncertain times during the last year, including the filing of Chapter 11 under the U.S. Bankruptcy Code. We are now embarked on the reconstruction of our company and are committed to returning White Farm Equipment to financial viability with substantially reduced personnel and stringent cost controls.

In order to meet the challenges that lie ahead, insure the success of the Company, and preserve unbroken pension benefits to you, we must all contribute to a reduction of expenses. All of our active employees have accepted substantial wage and benefit reductions. We now find it necessary to ask you to contribute to this cost reduction program.

Effective May 1, 1981, all non-contributory retiree insurance will be discontinued. However, in order to provide you with the same insurance coverage at group rates, we have made arrangements with Equitable Life Assurance Society to offer you continued group coverage. The monthly premium costs shown below cover the total insurance program—partial coverage will not be available. For your information, the cost of equivalent coverage from other sources would be substantially higher than these group rates

. . .

White Farm offered the retirees the opportunity to continue their insurance coverage by paying for it themselves—$72.85 monthly premium for a single retiree, $140.75 for a retiree and spouse, and $158.03 for a family.

We at White Farm are committed to build this business profitably, in part to ensure that

## II. THE PROCEEDINGS BELOW

On July 29, 1981, the retirees commenced their adversary proceedings in the Bankruptcy Court by filing a verified complaint. The class action sought legal, equitable and declaratory relief under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201. The six named plaintiffs included four retirees and two surviving spouses of deceased retirees. They sued on behalf of more than 750 retirees and surviving spouses who were receiving retirement benefits under the Welfare Benefit Plan prior to May 1, 1981. The defendants were White Farm, White Motor, TIC, and Equitable.

The complaint contended that by terminating the Plan the defendants "breached their contractual obligation to plaintiffs and all other members of the class arising out of defendants' undertaking to furnish such insurance under the Welfare Benefit Plan as part of the compensation of the class members as employees of White Farm," and also "breached their fiduciary obligations, in violation of § 404 and § 406 of ERISA, 29 U.S.C.A. § 1104(a) and 1106 . . ." For relief, the retirees sought certification of a class; declaratory judgments that the Plan was governed by ERISA and breached in violation of ERISA; orders reinstating the Plan retroactive to May 1, 1981 and enjoining the defendants from terminating it; additional orders establishing the retirees as creditors holding high priority claims against the White Farm and White Motor estates; and other relief. On July 14, 1981, the retirees supplemented their pleadings with a motion for a temporary restraining order and a preliminary injunction retroactively reinstating benefits and enjoining termination of the Welfare Benefit Plan.

The Bankruptcy Court held a preliminary hearing at which "The Court and the parties agreed to attack as a threshold question the legal sufficiency of the Retirees'

your many years of service are properly rewarded.

claims." Bankruptcy Court Opinion ("Opinion") at 4. White Farm and TIC then moved to dismiss the complaint, arguing that ERISA—which all parties agreed governed employee welfare benefit plans—contained no provision prohibiting termination of White Farm's Welfare Benefit Plan. The retirees agreed that ERISA did not expressly bar termination, but contended that Congress intended that courts fashion federal common law governing welfare benefit plans, and urged the court to hold that such plans are contractually enforceable. The Bankruptcy Court held another hearing, after which it directed the parties to issue notice to all potential class members. The notice advised recipients of the action, of a September 18, 1981 hearing on the motion to dismiss, and of their right to appear and be heard at the hearing.

Prior to the hearing, the retirees moved for partial summary judgment on the issue of liability. They argued that they were entitled to such an order based on the applicable law and undisputed facts derived from affidavits, documents produced during discovery, and testimony elicited at the deposition of White Farm's vice president for finance and administration, James H. Slife ("WFE Deposition"). The retirees deemed the following facts to be undisputed:

8. A formal, written document known as the White Motor Corporation Insurance Plan for Salary Retirees either does not exist or cannot be found. Rather, the retirees insurance coverage benefits are described and summarized in booklets applicable to various groups of the Salary Retirees identified by plant location. (WFE Deposition, Exhibits 9 to 20) As described in the several booklets, the Salary Retirees were provided essentially the same types of insurance coverages, namely: hospital, surgical and medical, dental, hearing aid, and prescription drug.

9. The Salary Retirees, most of whom retired prior to the filing of the petition by WFE for reorganization, were furnished the insurance coverages as part of their retirement benefits. (Hansen affidavit; WFE Deposition).

10. The discontinuation of the retiree insurance coverages was based solely on financial considerations by WFE in its effort to trim costs, and was not due to any causes of forfeiture of such insurance coverages pertaining to any particular Salary Retiree. (WFE Deposition).

At the September 18, 1981 hearing, the Bankruptcy Court heard arguments on the retirees' motion and on the White Farm/TIC motion to dismiss.[7] When the judge stated his belief that the termination clause, as summarized in the 1978 Booklet, was relevant to the motion to dismiss, the retirees requested additional discovery, since they had received no adequate response to their requests for the formal document containing the clause. The retirees also moved to withdraw their motion for partial summary judgment.

A year later, the Bankruptcy Court issued an opinion. The court considered materials other than the pleadings and, pursuant to Fed.R.Civ.P. 12(b), dealt with the White Farm/TIC motion to dismiss as one for summary judgment. It then granted the motion, denied the retirees' motion to withdraw their motion for partial summary judgment, and denied that motion.

In its findings of fact, the court rejected the retirees' claims that discovery concerning their termination clause had been inadequate, found the answers to their unanswered questions to be not germane, determined that "the master Welfare Benefit Plan is a phantom," and concluded that "the plain language of the various insurance coverage description booklets ... does not admit of a construction other than that WFE retained the unqualified power to ter-

---

7. In addition to the plaintiffs and defendants, the court heard from two other parties: the Official Creditors' Committee of White Farm ("Creditors' Committee"), which endorsed White Farm's position, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), which appeared on behalf of the plaintiffs.

During another portion of the hearing, three retired White Farm employees testified about the hardships caused by cancellation of the Welfare Benefit Plan.

minate or amend the Insurance Benefits under the Welfare Benefit Plan." Opinion at 18–20. It then turned to the question of "whether ERISA disallows the exercise of such clauses against retirees." *Id.* at 24.

The court found the Welfare Benefit Plan to be an "employee welfare benefit plan" as defined by ERISA and held that the statute's preemption clause made ERISA the sole regulator of such plans. Ruling for the defendants because "Congress addressed the matter of the vesting of welfare benefits and determined not to require the vesting of such benefits at all," *Id.* at 31, the court determined that Congressional intent was so clear that no rule of federal common law could properly be fashioned. It relied on three legislative and administrative provisions: "the express exclusion of welfare plans from the minimum vesting and participation standards" contained in 29 U.S.C. § 1051(1); the exclusion of welfare benefits from "accrued benefits" in 26 C.F.R. § 1.411(a)–7(a)(ii); and "29 U.S.C. § 1103(d)(2), which, by providing for the manner of distribution of welfare plan assets upon termination, expressly permits welfare plan termination." *Id.* at 31–32.

## III. ERISA AND WELFARE BENEFIT PLANS

On appeal, the retirees challenge the Bankruptcy Court's interpretation of ERISA. They contend that the statutory language does not expressly authorize termination of welfare benefit plans; that the Bankruptcy Court was therefore compelled to formulate and apply a federal common law rule derived from legislative history and state law; that an appropriate rule would provide the retirees a vested contractual right to their benefits; that the Bankruptcy Court's construction of ERISA deprived them of due process; and that pre-1978 retirees should not be bound by the termination clause allegedly contained in the formal documents summarized in the 1978 Booklet. They also argue that enough disputed facts exist concerning the termination clause to render erroneous the summary judgment granted to the defendants.

## A. The Statutory Scheme: Preemption

Congress enacted ERISA in 1974 after studying private benefit plans for almost a decade. "As a predicate for this comprehensive and reticulated statute, Congress made detailed findings which recited, in part, 'that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; [and] that owing to the termination of plans before requisite funds have been accumulated, employees have been deprived of anticipated benefits ...' ERISA § 2(a), 29 U.S.C. § 1001(a)." *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361–62, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980). The statute has withstood numerous challenges to its scope and constitutionality. *See generally Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, —— U.S. ——, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984).

Title 29 U.S.C. § 1144 provides that ERISA supersedes all state laws governing employee benefits:

(a) ... [T]he provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

(c) For purposes of this section:

(1) The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State....

(2) The term "State" includes a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter.

In *Shaw v. Delta Air Lines, Inc.*, —— U.S. ——, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), and *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981), the Supreme Court held that this provision demonstrates Congres-

sional intent to supersede state statutes and common law purporting to regulate, directly or indirectly, the terms and conditions of employee benefit plans. The *Shaw* Court concluded that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.... In fact, ... Congress used the words 'relates to' in [§ 1144(a)] in their broad sense." 103 S.Ct. at 2900. The statute exempts only those state actions which "may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Id.* at 2901 n. 21; *see Savings and Profit Sharing Fund of Sears Employees v. Gago,* 717 F.2d 1038, 1040 (7th Cir.1983) (discussing *Shaw*). *Shaw* therefore reaffirms the *Alessi* holding that Congress "meant to establish pension plan regulation as exclusively a federal concern." 451 U.S. at 523, 101 S.Ct. at 1906; *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1215 (8th Cir.1981) ("We conclude that Congress legislated an ouster of all state laws

relating to employee benefit plans, given the 'unambiguous congressional mandate to that effect' contained in section 1144.")

It is therefore undisputed that ERISA and the case law developed under it govern defendants' termination of the Welfare Benefit Plan.

### B. *The Statutory Scheme: Welfare Plans and Pension Plans*

Title 29 U.S.C. § 1002 defines "employee welfare benefit plans"[8] and expressly distinguishes them from "employee pension benefit plans."[9] Both are deemed to be "employee benefit plans" regulated by ER-ISA.[10] In the following section, however, the statute limits the scope of the restrictions imposed upon welfare benefit plans. Title 29 U.S.C. § 1003(a) states that ERISA governs employee benefit plans except as otherwise provided in, *inter alia,* §§ 1051 and 1081[11]; 29 U.S.C. §§ 1051(1) and 1081(a)(1), in turn, exempt employee welfare benefit plans from ERISA's stringent participation, vesting, and funding standards.[12]

**8.** Title 29 U.S.C. § 1002(1) provides:

The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization or by both, to the extent that such plan, fund or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

**9.** Title 29 U.S.C. § 1002(2) provides:

The terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

(A) provides retirement income to employees, or

(B) results in a deferral of income by employees for periods extending to the termina-

tion of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

**10.** Title 29 U.S.C. § 1002(3) provides

The term "employee benefit plan" or "plan" means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.

**11.** Title 29 U.S.C. § 1003(a) states:

Except as provided in subsection (b) of this section and in sections 1051, 1081, and 1101 of this title, this subchapter shall apply to any employee benefit plan if it is established or maintained—

(1) by any employer engaged in commerce or in any industry or activity affecting interstate commerce; or

(2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce, or

(3) by both.

**12.** Title 29 U.S.C. §§ 1051 and 1081(a) introduce Parts 2 and 3, respectively, of ERISA, which concern participation, vesting and funding requirements. They state in identical language:

This part shall apply to any employee benefit plan described in section 1003(a) of this

The Bankruptcy Court examined the statute and concluded that "[a] literal reading of ERISA reveals ... that Congress addressed the matter of the vesting of welfare benefits and determined not to require the vesting of such benefits at all." Opinion at 31. The court relied on the exclusion of employee welfare benefit plans from vesting requirements, as set forth in § 1051(1); on the exclusion of benefits under such plans from the definition of "accrued benefits" in 26 C.F.R. § 1.411(a)–7(a)(ii); [13] on the reference to terminated welfare plans found in 29 U.S.C. § 1103(d)(2); [14] and on selected portions of ERISA's legislative history.

■ While the retirees agree with the Bankruptcy Court's conclusion that ERISA does not extend to employee welfare benefit plans many of the requirements and protections imposed upon pension plans, they argue convincingly that it is unreasonable to infer from this omission an express Congressional intent to permit unregulated termination of such plans. Section 1051(1) means no more than that ERISA's detailed pre-retirement vesting requirement "only applies to pension plans and not to health and life insurance benefits." *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) v. Roblin Industries,*

title (and not exempted under section 1003(b) of this title) other than—

(1) an employee welfare benefit plan;

\*    \*    \*    \*    \*    \*

**13.** Title 26 C.F.R. § 1.411(a)–7(a)(ii) provides in part:

... In general, the term "accrued benefits" refers only to pension or retirement benefits. Consequently, accrued benefits do not include ancillary benefits not directly related to retirement benefits such as payment of medical expenses (or insurance premiums for such expenses), disability benefits ..., life insurance benefits payable as a lump sum, incidental death benefits, current life insurance protection, or medical benefits ...

**14.** Title 29 U.S.C. § 1103(d)(2) provides:

The assets of a welfare plan which terminates shall be distributed in accordance with the terms of the plan, except as otherwise provided in regulations of the Secretary.

**15.** *See, e.g., A–T–O, Inc. v. Pension Benefit Guaranty Corp.,* 634 F.2d 1013, 1021 (6th Cir.1980):

*Inc.,* 561 F.Supp. 288, 299–300 (W.D.Mich. 1983). By no means does it foreclose the possibility that such benefits may vest contractually pursuant to the terms of the plan. Similarly, § 1003(d)(2) has never been held to explicitly permit, rather than merely acknowledge, the termination of welfare benefit plans, nor can it sensibly be read to do so. Next, 26 C.F.R. § 1.411(a)–7(a)(ii) is no more than a regulation promulgated by the Internal Revenue Service concerning the tax consequences of certain retirement and retirement-related benefits. Finally, the passages of legislative history cited in the opinion below reaffirm a point with which the retirees do not quarrel—that Congress, in balancing economics and equities while drafting the ERISA statute, did not extend all statutory vesting requirements to employee welfare benefit plans.[15]

■ This Court therefore agrees with the retirees' contention that no leap of logic transforms Congress' exclusion of welfare benefit plans from various ERISA requirements into an express endorsement of unfettered unilateral termination of such plans.[16] No such intention can be found in, deduced from, or formulated consistent with a statute whose purpose was to prevent the "great personal tragedy" suffered by employees whose benefits were termi-

Though Congress was concerned chiefly with protecting the employees' expectations of pension benefits, it also realized that employers would not create, maintain, or expand pension plans if ERISA imposed too much cost. Consequently, the entire statute is a finely tuned balance between protecting pension benefits for employees while limiting the cost to employers.

**16.** Nor can such an endorsement be gleaned from a statutory provision not cited by the Bankruptcy Court but relied upon by the defendants, 29 U.S.C. § 1053(a), under which "[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon attainment of normal retirement age." Section 1053 is simply one part of the entire vesting scheme from which Congress excluded welfare benefit plans. That a provision requiring vesting of pension benefits upon retirement was included in Part 2 of ERISA does not mean that Congress favored or even condoned termination of post-retirement non-pension benefits.

nated. *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. at 374, 100 S.Ct. at 1732–33.[17] Consequently, the Bankruptcy Court erred when it held that the statutory language itself defeated the retirees' cause of action.

## C. *Federal Common Law*

■ The Bankruptcy Court also erred in refusing to fashion a federal common law rule of decision governing welfare benefit plans. In its most recent important statement on federal common law, *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), the Supreme Court stated:

> Federal courts, unlike state courts, are not general common-law courts and do not possess a general power to develop and apply their own rules of decision.... The enactment of a federal rule in an area of national concern, and the decision whether to displace the state law in doing so, is generally made not by the federal judiciary, purposefully insulated from democratic pressures, but by the people through their elected representatives in Congress....
>
> When Congress has not spoken to a particular issue, however, and when there exists a "significant conflict between some federal policy or interest and the use of state law," ... the Court has found it necessary, in a "few and restricted" instances ... to develop federal common law....
>
> We have always recognized that federal common law is "subject to the paramount authority of Congress." ... It is resorted to "[i]n the absence of an applicable Act of Congress," ... and because the Court is compelled to consider feder-

al questions "which cannot be answered from federal statutes alone," *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 469 [62 S.Ct. 676, 684, 86 L.Ed. 956] (1942) (Jackson, J., concurring).

*Id.* at 313–14, 101 S.Ct. at 1790–91 (other citations omitted). Employee benefits are a field which Congress has preempted with a statute that leaves important federal questions unanswered, compelling the formulation of federal common law.

Reviewing ERISA, the court in *Wayne Chemical v. Columbus Agency Service Corp.*, 426 F.Supp. 316, 322 (N.D.Ind.), *aff'd as modified*, 567 F.2d 692 (7th Cir. 1977), stated:

> The creation of a federal common law governing [employee benefit plans not specifically regulated by ERISA] may be implied, moreover, from the statutory scheme itself. Where state law is preempted and no specific federal provision governs, a "court is forced to make law or leave a void where neither state nor federal law applies. In such a situation it is a reasonable inference that Congress intended some law, and therefore federal law, to apply." *Note, The Federal Common Law*, 82 Harv.L.Rev. 1512, 1522 (1969). The court concludes that the statutory scheme, as well as the legislative history of ERISA, support the "reasonable inference" that this court is mandated to formulate and apply a federal rule of decision in this case.

Likewise, in this circuit one court has noted:

> ... [N]othing in ERISA indicates that Congress intended to make contracts unenforceable. Rather, if the state law is preempted, then the contract must be

---

**17.** In this context, it is worth noting again Congress' unusually long and detailed introduction to ERISA, 29 U.S.C. § 1001, which declares in part:

> (a) ... that despite the enormous growth in such plans many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans; that owing to the inadequacy of current minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised bene-

fits may be endangered; that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits; and that it is therefore desirable in the interests of employees and their beneficiaries, for the protection of the revenue of the United States, and to provide for the free flow of commerce, that minimum standards be provided assuring the equitable character of such plans and their financial soundness.

construed in accordance with federal law, in this case the federal common law of contract.

*Holliday v. Xerox Corp.*, 555 F.Supp. 51, 55 (E.D.Mich.1982), *aff'd,* 732 F.2d 548 (6th Cir.1984). *See also Woodfork v. Marine Cooks & Stewards Union,* 642 F.2d 966, 972–73 (5th Cir.1981); *Murphy v. Heppenstall,* 635 F.2d 233, 237 (3rd Cir.1980), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982); *Amato v. Bernard,* 618 F.2d 559, 567 (9th Cir.1980); *Shaw v. Kruidenier,* 470 F.Supp. 1375, 1382 (S.D. Iowa 1979), *aff'd,* 620 F.2d 307 (8th Cir. 1980); *Taylor v. Bakery and Confectionary Welfare Fund,* 455 F.Supp. 816, 819 (E.D.N.C.1978).

▐ Indeed, the pertinent legislative history indicates that Congress, recognizing that the preemption provisions of 29 U.S.C. § 1144 barred direct application of formerly relevant state law to employee benefit cases, instructed federal courts to formulate federal common law to fill gaps in the ERISA structure:

> In view of Federal preemption, State laws compelling disclosure from private welfare or pension plans, imposing fiduciary requirements on such plans, imposing criminal penalties on failure to contribute to plans—unless a criminal statute of general application—establishing State termination insurance programs, et cetera, will be superseded. *It is also intended that a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans.*

120 Cong.Rec. S15751 (daily ed. August 22, 1974) (remarks of Sen. Javits) (emphasis added). Furthermore, the House Conference Report accompanying ERISA stated that all actions to enforce ERISA "are to be regarded as arising under the laws of the United States in similar fashion to those brought under section 301 of the Labor-Management Relations Act of 1947." H.R.Conf.Rep. No. 93–1280, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 5106–07 ("Conference Report"). Section 301, of course, is the paradigmatic federal statute under which courts have fashioned federal common law. *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *see* P. Bator, D. Shapiro, P. Mishkin & H. Wechsler, *Hart and Wechsler's The Federal Courts and the Federal System* 786 (2d ed. 1973 & Supp.1981).

▐ In sum, whether the retirees state a claim under ERISA, and whether on the undisputed facts they were entitled to relief, is a question to be determined by reference to federal common law.[18] The next inquiry concerns the appropriate sources and content of a federal rule of decision.

## IV. FEDERAL COMMON LAW AND EMPLOYEE WELFARE BENEFIT PLANS

### A. *Sources of Federal Common Law*

"The guideposts in fashioning a rule of decision in the present case are the policies underlying ERISA." *Wayne Chemical v. Columbus Agency Service Corp.,* 426 F.Supp. at 322. In *Wayne Chemical,* the court reviewed specific statutory provisions and the declaration of Congressional goals found in 29 U.S.C. § 1001, but added that "it is appropriate also to consider the

---

**18.** White Farm and the other appellees defend the Bankruptcy Court's refusal to apply federal common law by relying upon *Van Orman v. American Insurance Co.,* 680 F.2d 301, 312 (3d Cir.1982), and *Stone & Webster Engineering Corp. v. Ilsley,* 690 F.2d 323 (2d Cir.1982). Neither case is apposite. In *Van Orman,* the Third Circuit—which had recognized the role of federal common law under ERISA in *Murphy v. Heppenstall*—reaffirmed that it is "clear that Congress intended federal courts to fashion a federal common law concerning pensions under ERISA," but declined "to fashion a federal common-law doctrine of unjust enrichment when such a right would override a contractual provision." 680 F.2d at 311–12. In this case no "contractual provision" is even before the Court, and this appeal poses questions of interpretation and limitation, not "overriding." *Stone & Webster,* where the court invoked ERISA's preemption provision to invalidate a Connecticut statute which "constitutes a forbidden state encroachment on a private employee benefit plan," 690 F.2d at 329, is irrelevant to questions of federal common law.

broadly ameliorative policy of the Act ..." *Id.* Within those guideposts, the court looked to the pre-ERISA state law of retirement benefits:

> Where the courts are required themselves to fashion a federal rule of decision, the source of that law must be federal and uniform. Yet, state law where compatible with national policy may be resorted to and adopted as a federal rule of decision.... Here, of course, there is little federal law to which the court may turn for guidance. State regulation of insurance, pensions, and other such programs, however, provides a pre-existing source of experience and experiment in an area in which there is, as yet, only federal inexperience....
>
> There is impressive authority for reference to state statutes in formulating federal common law rules of decision. In *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375 [90 S.Ct. 1772, 26 L.Ed.2d 339] (1970), the Supreme Court held that the general maritime law provides an action for wrongful death. In overruling ancient precedent, the court noted numerous state and federal statutory inroads upon the common law failure to provide a remedy for wrongful death. In the absence of a contrary legislative directive, mere legislative failure to provide such a remedy under the general maritime law was not seen as a bar to the judicial creation of the remedy.

*Id.* at 325 (citations omitted).[19]

The court therefore deemed it appropriate to formulate a federal common law rule based on an Indiana statute that, prior to ERISA, had forbidden termination of certain benefit payments. Granting a preliminary injunction to the beneficiary of an employee welfare benefit plan, the court further stated:

> This court concludes that effectuation of the federal policy embodied by ERI-SA, and a circumspect regard for the state policies evidenced in statutes similar to the Indiana "extension" statute, demand that this state statutory policy be incorporated into the federal common law of employee benefit plans. To do otherwise would create anomalies not unlike those which the Court in *Moragne* sought to avoid.... Absent a federal rule of this sort, beneficiaries of employee benefit plans are denied protection which is available under state law to beneficiaries of private plans in the majority of the states. Such a result would run contrary to the ameliorative policy underlying ERISA. Furthermore, it would not be consistent with congressional concern with ensuring coverage for employee benefit plan beneficiaries to oblige them under such circumstances to seek aid from state and federal welfare agencies. Finally, there is no indication that Congress sought to frustrate the important state policies represented by the "extension" statutes, particularly where those statutes do not hamper the ERISA program.

*Id.*[20]

## B. *State Law of Benefit Plan Termination*

Consequently, this Court turns to state law as a source for a federal common law rule relevant to the retirees' claims that upon retirement they acquired a vested right to payments under the Welfare Benefit Plan.

An older line of cases, relied upon by the defendants, held that an employer acting pursuant to a reserved right to terminate payments unambiguously provided under a benefit plan could unilaterally modify or discontinue the benefits, even after a former employee had begun receiving retirement payments from the benefit fund.

---

**19.** *See also Holliday v. Xerox Corp.*, 555 F.Supp. at 55 ("There is no substantial body of federal common law of contract. Thus, state law will be looked to as a guide.").

**20.** On appeal, the Seventh Circuit concluded "that the Indiana law governing the insurance transaction in issue here was not preempted by ERISA," 567 F.2d at 700, and consequently found it "unnecessary for us to reach the issue on which the District Court rested its decision, *viz.*, the rule to be adopted as federal common law when state regulatory statutes are preempted." *Id.* at 697.

*See, e.g., Boase v. Lee Rubber & Tire Corp.*, 437 F.2d 527, 532–33 (3d Cir.1970) (applying New York law) (and cases cited therein); Annot., 46 A.L.R.3d 464 at § 4[b]. In *Boase*, the court held that retired employees "ceased to possess any enforceable rights against Lee once the company elected to put into effect the amending and terminating conditions expressly set forth in the instrument." 437 F.2d at 533.

During the past thirty years, however, more and more courts have accepted "the modern view that the promise of a pension constitutes an offer which, upon performance of the required service by the employee[,] becomes a binding obligation." *Hoefel v. Atlas Tack Corp.*, 581 F.2d 1, 4 (1st Cir.1978), *cert. denied*, 440 U.S. 911, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979) (applying Massachusetts law) (and cases cited therein). The court cited consistent cases involving the laws of eight different states, and quoted with approval the Fourth Circuit's application of the law of a ninth:

> The pension plan provided that all employees of the defendant, if they remained in the employ of the defendant ten or more years would be entitled, on attaining retirement age, to certain specified pension rights. While unilateral, that offer, when accepted by an employee as evidenced by rendering services for ten or more years, became "irrevocable" and such employee acquired "a right no less contractual than if the plan were expressly bargained for." By rendering service for the period required under the plan, the employee's rights to the benefits under the plans are "earned no less than the salary paid to him (the employee) each pay period" and are "in the nature of delayed compensation for former years of faithful service." Whether the plan be contributory or noncontributory the benefits, thus earned, are not gratuities.

*Rochester Corp. v. Rochester*, 450 F.2d 118, 120–21 (4th Cir.1971) (applying Virginia law) (citations omitted). *See also Landro v. Glendenning Motorways, Inc.*, 625 F.2d 1344, 1353 (8th Cir.1980) (Minnesota law); Annot., 46 A.L.R.3d 464 at § 4[a]

(summarizing state law consistent with modern view).

The *Hoefel* court also endorsed the view expressed by the Ohio Supreme Court in *Cantor v. Berkshire Life Ins. Co.*, 171 Ohio St. 405, 171 N.E.2d 518 (1960). While Ohio law does not govern this dispute, but merely contributes to formulating a federal common law rule, the *Cantor* court powerfully expressed the rationale underlying the modern view. Shortly after an employee's retirement, his former employer attempted to cancel his benefits under a reserved termination clause. The court found that in return for the retirement program the employer had received consideration "in the form of a more stable and more contented labor force", and held that the program gives rise to contractual rights, enforceable by a retired employee despite the presence of a termination clause in the contract. "Clearly, under our economic system, an employer cannot offer a retirement system as an inducement to employment and, after an employee has accepted employment under such circumstances, withdraw or terminate the program after an employee has complied with all the conditions entitling him to retirement rights thereunder." *Id.* at 410, 171 N.E.2d 518. The syllabus states:

> Where an employee has complied with all the conditions of his employment contract relating to retirement benefits and has reached the retirement age specified in the contract, his retirement rights become vested, and an employer cannot, in the absence of one of the specified causes set forth in the contract for the divestiture of retirement benefits, divest him of such right by the exercise of a provision in the contract allowing termination thereof without cause.

A later case, *Sheehy v. Seilon, Inc.*, 10 Ohio St.2d 242, 227 N.E.2d 229 (1967), affirmed an order that a successor corporation continue retired employees' insurance coverage, holding that "through the inducements and actions of the employer these employees, upon retirement, acquired a vested right to the continuance by the employer of the insurance coverage." 10

Ohio St.2d at 243, 227 N.E.2d 229. The Ohio Supreme Court reaffirmed *Cantor* in *Luli v. Sun Products Corp.*, 60 Ohio St.2d 144, 398 N.E.2d 553 (1979) (in pre-ERISA cause of action, syllabus approves and follows *Cantor* syllabus), and the Sixth Circuit has endorsed its position on at least two occasions. In *Matter of Erie Lackawanna Ry. Co.*, 548 F.2d 621 (6th Cir.1977), the court found that the trustee of a bankrupt employer's estate was obligated to continue indefinitely to pay the premiums on retirees' life insurance. "It is our opinion that these claims constitute valid contract rights not only under [non-ERISA] federal law but also under the law of Ohio where the group insurance policy was issued and delivered." *Id.* at 625. In *United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984), the court sought to establish the context in which the parties had drafted a collective bargaining agreement provision concerning retirees' life and health insurance benefits. The panel found it "unlikely" that continuing insurance benefits for employees,

> which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations. *See, e.g.,* ... *Cantor* ... If [employees] forego wages now in expectation of retiree benefits, they would want assurance that once they retire they will continue to receive such benefits regardless of the bargain reached in subsequent agreements.

*Id.* at 1482 (other citations omitted). While this language is *dicta, Yard-Man*—a labor law case decided under the federal common law of collective bargaining agreements— is an important further endorsement of the modern view that welfare benefits vest upon retirement.

### C. *Consistency with Congressional Intent*

The defendants contend that the modern view is inconsistent with Congressional intent in passing ERISA. Correctly contend-

ing that ERISA is a "finely tuned balance" between employee and employer rights and obligations, they find "particularly instructive" a passage in the legislative history discussing the meaning of "accrued benefit"—the only form of benefit which vests under 29 U.S.C. § 1053:

> The term "accrued benefit" refers to pension or retirement benefits and is not intended to apply to ancillary benefits, such as medical insurance or life insurance, which are sometimes provided for employees in conjunction with a pension plan, and are sometimes provided separately. To require the vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income. *Also, where the employee moves from one employer to another, the ancillary benefits (which are usually on a contingency basis) would often be provided by the new employer, whereas the new employer would not provide pension benefits based on service with the old employer.*

Conference Report, *reprinted at* 1974 U.S. Code Cong. & Admin.News at 4726 (emphasis added).

The quoted language is entirely consistent with a point that the retirees do not contest—that Congress, for defensible and well-articulated reasons, chose not to impose ERISA's pre-retirement vesting provisions onto welfare benefit plans. Furthermore, as the emphasized language indicates, that decision rested in large part on the economic reality that an employee moving from job to job acquires new welfare benefits, but does not acquire pension benefits for time served elsewhere. However, a logical corollary is that an employee upon retiring does not move on to new employment involving a new source of welfare benefits. In the absence of some Congressional statement explicitly denying retirees any right to welfare benefits, their post-retirement right to such benefits is to be determined by federal common law. *See* Part III–C, *supra.*

■ On consideration, this Court finds that the modern view concerning benefit plans, under which an employer may not invoke a termination clause to cut off the benefits of a former employee who has properly retired pursuant to the employer's requirements, should be adopted as a rule of federal common law under ERISA. As enunciated in *Hoefel, Rochester, Landro, Erie Lackawanna* and the cases cited therein, it offers a rule of decision which is logical, consistent with economic reality, sensible, just, and entirely compatible with Congress' ameliorative goals in passing a benefits reform statute.

### D. *The Retirees' Rights*

Based on this standard, the Bankruptcy Court erred in granting summary judgment to the defendants, and further erred in denying the retirees' own motion for summary judgment. Assuming *arguendo* that the undisputed facts prove the existence of a termination clause in the formal documents summarized in the 1978 Booklet, at the time the retirees completed their employment with White Farm they nonetheless acquired a vested contractual right to continued coverage under the Welfare Benefit Plan. Since the retirees were long since retired as of May 1, 1981, when their benefits were terminated, federal common law compels a ruling that this action was improper, and that the benefits must be retroactively reinstated and prospectively provided. Accordingly, the named plaintiffs were entitled to a declaratory judgment as to their rights under the Welfare Benefit Plan and partial summary judgment on the issue of liability.[21]

### V. THE TERMINATION CLAUSE

The Bankruptcy Court also erred by concluding that undisputed facts demonstrated that the Plan contained a termination clause permitting the benefit cutoff. Fed. R.Civ.P. 52(a) mandates that "[f]indings of fact shall not be set aside unless clearly erroneous ...." *See Inwood Laboratories,*

*Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 855–56, 102 S.Ct. 2182, 2188–89, 72 L.Ed.2d 606 (1982); *cf. Bose Corp. v. Consumers Union of United States, Inc.,* —— U.S. ——, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984).

### A. *The 1978 Booklet*

■ The court relied heavily on the following language, found in the 1978 Booklet at 16 ¶ 13 ("Paragraph 13"):

13. CONTINUANCE OF THE PLAN: The Company fully intends to continue your plans indefinitely. However, the Company does reserve the right to change the plans, and, if necessary, discontinue them. If it is necessary to discontinue the Pension Plan, the assets of the Pension Fund will be used to provide benefits according to the Plan document.

The court described this language as unambiguous evidence of "the reservation by WFE of an unqualified power to amend or terminate the Welfare Benefit Plan." Opinion at 24. It is not.

Paragraph 13 refers to "plans" without stating which employee benefit programs are subject to termination. In the 1978 Booklet at 14 ¶ 7, two pages before Paragraph 13, a chart with the heading "Plan Numbers" includes fourteen different plan numbers, six of which are pension plan numbers and eight of which are welfare plan numbers. "Plans" in Paragraph 13 could refer to all the plans; only to the pension plans; only to the welfare plans; or to some but not all of one or the other or both.

The confusion is heightened by the material found under the heading "Name of Plans" in the 1978 Booklet at 13. Only two plans are listed: the White Motor Corporation Pension Plan for Salary Employees and the White Motor Corporation Insurance Plan for Salary Employees. The latter contains the additional parenthetical

---

**21.** In light of this holding, it is neither necessary nor appropriate to reach retirees' contention that the Bankruptcy Court's reading of ERISA violated their due process rights. *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–

47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 1860 n. 10, 75 L.Ed.2d 903 (1983).

designation "(Welfare Plans)". *Id.* at ¶ 1. Since only the welfare plans are referred to in the plural, the term "plans" in Paragraph 13 might be construed to refer only to the welfare plans. Such a reading, however, is inconsistent with the third sentence of the paragraph, which states:

> ... If it is necessary to discontinue the Pension Plan, the assets of the Pension Fund will be used to provide benefits according to the Plan document.

From this language, it is apparent that the pension plan or plans are among the programs that may be discontinued and that a "Plan document" will govern the events following termination. This "Plan document" was never produced during discovery, and the Bankruptcy Court offered no evidence in support of its conclusion that "the master Welfare Benefit Plan is a phantom." Opinion at 19. Furthermore, assuming that Paragraph 13 is an accurate summary of the Plan document, a sweeping termination clause permitting cancellation of both pension and welfare plans may well be void for being in direct violation of ERISA—a statute which regulates and in some instances prohibits the cancellation of pension plans. *See* 29 U.S.C. §§ 1051 *et seq.* In sum, standing on its own Paragraph 13 is either ambiguous or void. It can only be meaningfully construed in conjunction with the "Plan document" or other pertinent documents not yet produced. To conclude from its three sentences that undisputed facts established the defendants' right to terminate the Welfare Benefit Plan was clear error.

B. *The 1970 Booklets*

The Bankruptcy Court also relied on a number of passing references in the 1970 Booklets to changes, amendments, or termination of the group insurance policies. None of these references are unambiguous statements advising employees or retirees that the Welfare Benefit Plan is subject to termination. Rather, the statements merely illustrate provisions of the Plan governing situations such as unemployment, loss of eligibility, or survivorship status.

Initially, it is not certain whether the clauses cited by the court are directed at retirees or at active employees:

WHEN INSURANCE TERMINATES

Your insurance terminates when you leave our employ, when you are no longer eligible or *when the group policy terminates,* whichever happens first.

1970 Booklet for Exempt Employees ("Green Booklet") at 34; 1970 Booklet for Non-Exempt Employees ("Red Booklet") at 33 (emphasis added).

Protection after termination

\* \* \* \* \* \*

B. If your Group Life insurance terminates because *the Group policy is terminated or amended,* ... you may also make application to convert your Group Life insurance to an individual Life insurance policy ...

Green Booklet at 5; Red Booklet at 4 (emphasis added).

Protection After Termination of Survivor Income Benefits

\* \* \* \* \* \*

B. If you die within 31 days following termination of insurance because of termination of your employment in the class or classes of employees insured under the Group Policy, or *because the Group policy is terminated or amended,* Survivor Income Benefits will be payable if you had remained insured until your death ...

Green Booklet at 6; Red Booklet at 5 (emphasis added).

MODIFIED BENEFITS AFTER TERMINATION OF INSURANCE

If a person's insurance terminates *due to termination of the Major Medical Expense Insurance or its amendment to terminate the class of insured persons of which such person is a member,* all Major Medical Expense benefits will cease on the date of such termination ...

Green Booklet at 30; Red Booklet at 29 (emphasis added).

Moreover, reading the various provisions together, it is impossible to sustain the Bankruptcy Court's decision to infer the existence of a specific termination clause

from the various references to termination. No specific termination clause is ever cited; rather, the phrases do no more than suggest what may happen if a policy is terminated. They cannot be read as an expression of the defendants' power to unilaterally effectuate such a termination.

C. *Summary*

■ The words and phrases contained in the booklets, in particular Paragraph 13 of the 1978 Booklet, do not constitute an unambiguous termination clause. Once the language of an agreement is held to be ambiguous, its interpretation is a factual issue turning on the intent of the parties. *Heheman v. E.W. Scripps Co.,* 661 F.2d 1115 (6th Cir.1981), *reh'g denied,* 668 F.2d 878, *cert. denied,* 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982). Consequently, even if the Bankruptcy Court had been correct in its determination that the alleged termination clause was relevant to the legal issues in this case, the factual disputes surrounding the existence of the clause made summary judgment inappropriate. Additional discovery should have been permitted and a hearing held to enable the court to resolve the ambiguities in the booklets' language and determine if the Plan included a termination clause.

## VI. CONCLUSION

A. *Jurisdiction Over Future Proceedings*

■ At the time this action was commenced, the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549, required that it be brought in the Bankruptcy Court. The jurisdiction of that court has subsequently been diminished, first by *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), and then by the recently-passed bankruptcy amendments. Title 28 U.S.C. § 1334 now provides in part:

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act of Congress that confers original jurisdiction on

a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

Title 28 U.S.C. §§ 157–58 set forth the various matters which may be heard by Article I bankruptcy judge, and the mechanisms for review of those decisions by Article III district court judges. Of particular relevance is § 157(d), which provides:

The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or timely motion of any party, for good cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

This Court has recently denied a party's motion to withdraw a proceeding from the Bankruptcy Court under the second sentence of § 157(d) when the party failed to conclusively demonstrate that "current proceedings before the Bankruptcy Court cannot be resolved without substantial and material consideration of ERISA and [Internal Revenue Code] provisions." *In re White Motor Corp.,* 42 B.R. 693, 704 (N.D. Ohio 1984). In this case, however, further proceedings with respect to defendants' possible liability to the proposed class involve ERISA, federal common law and federal civil procedure. Consequently, pursuant to the first sentence of § 157(d), this Court concludes that good cause is shown for continuing its jurisdiction over liability aspects of this case, without foreclosing the possibility of referring subsequent issues involving the Bankruptcy Code to the Bankruptcy Court pursuant to § 157(a).

B. *Order*

(1) It is ordered that the decision of the Bankruptcy Court granting summary judgment in favor of the defendants is reversed;

(2) It is ordered, decreed, and adjudged that the defendants' termination of the Welfare Benefit Plan violated federal common law under ERISA;

(3) It is ordered that partial summary judgment is entered for the named plaintiffs on the issue of liability, and that

(a) benefits due to the named plaintiffs under the Welfare Benefit Plan shall be reinstated retroactive to May 1, 1981; and

(b) the defendants are hereby enjoined from terminating any rights possessed by the named plaintiffs under the Welfare Benefit Plan;

(4) It is ordered that the plaintiffs submit a motion for class certification pursuant to Fed.R.Civ.P. 23 within fourteen (14) days; and that the defendants file appropriate responses.

IT IS SO ORDERED.